Jason S. Brookner (TX Bar No. 24033684)
Amber M. Carson (TX Bar No. 24075610)
Emily F. Shanks (TX Bar No. 24110350)
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:   (214) 954-4135
Facsimile:   (214) 953-1332
Email:       jbrookner@grayreed.com
             acarson@grayreed.com
             eshanks@grayreed.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| EYE CARE LEADERS PORTFOLIO HOLDINGS, LLC, *et al.*,[1] | § § § § | Case No. 24-80001(MVL) |
| Debtors. | § § § | (Jointly Administered) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING
AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS
AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING
ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtors' federal tax identification number are as follows: ECL PH Services Group LLC (6746); Eye Care Leaders Portfolio Holdings, LLC (0576); Alta Billing Holdings, LLC (4944); Alta Billing, LLC (4823); Canta Health, LLC (7791); DJRTC, LLC (N/A); ECL Group, LLC (9195); ECL Holdings, LLC (8888); Eye Care Leaders Holdings, LLC (1701); iMedicWare, Inc. (6251); IMW EMR, LLC (6421); IMW Holdings, LLC (3980); Insight Software, LLC (8321); Integrity EMR Holdings, LLC (3877); Integrity EMR, LLC (3716); IO Practiceware, Inc. (4507); IOPW Holdings, LLC (0461); IOPW, LLC (N/A); Keymed Holdings, LLC (0301); Keymed, LLC (9379); MD Office, LLC (9075); MDO Group Holdings, LLC (0435); MDX, LLC (5074); Medflow Holdings, LLC (7716); Medflow, Inc. (N/A); MNI Holdings, LLC (7633); MRX Holdings, LLC (N/A); My Vision Express, Inc. (N/A); Penn Medical Informatics Systems, LLC (4584); PI Software Holdings, LLC (N/A); PI Software, LLC (N/A); PMX, LLC (N/A); Revenue Health Solutions, LLC (7025); RHS Holdings, LLC (N/A); and The Hoehne Group – Software Division, Inc. (7788). The Debtors' principal offices are located at 555 S. Mangum Street, Suite 100, Durham, NC 27701.

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 2:30 P.M. ON JANUARY 25, 2024.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON JANUARY 25, 2024, AT 2:30 P.M. IN THE EARLE CABELL FEDERAL BUILDING, 1100 COMMERCE STREET, 14TH FLOOR, COURTROOM 2, DALLAS, TEXAS, 75242.**

**YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 1.650.479.3207. VIDEO COMMUNICATION WILL BE BY THE USE OF THE CISCO WEBEX PLATFORM. CONNECT VIA THE CISCO WEBEX APPLICATION OR THIS LINK: https://us-courts.webex.com/meet/larson. THE MEETING CODE IS 160 135 6015. CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF ELECTRONIC HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LARSON'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

### Introduction

1.    The Debtors request authority to: (a) enter into a senior secured loan facility in an aggregate principal amount of up to $8.0 million (the "DIP Facility") with the DIP Lender (defined below), with up to $1.3 million available on an interim basis; (b) to use cash collateral of the DIP Lender and to continue to use purported cash collateral of the Debtors' prepetition lenders under the terms of the Interim DIP Order (defined below); and (c) grant adequate protection to the Prepetition Lenders (defined below).

2.    The DIP Facility will provide the Debtors with sufficient liquidity to fund their business operations and administrative expenses during the contemplated duration of these chapter

4878-1562-0510

11 cases.  If approved, the Debtors will use the proceeds of the DIP Facility to, among other things, honor employee wages and benefits, procure goods and services, fund general and corporate operating needs and the administration of these chapter 11 cases, all in accordance with a budget agreed to by the Debtors and the DIP Lender (the "Approved Budget") attached as Exhibit 2 to the form of proposed interim order attached hereto as **Exhibit A** (the "Interim DIP Order").

3.      The Debtors and their estates would suffer immediate and irreparable harm if they were denied the financing needed to sustain on-going business operations during the critical first weeks of these cases.  The DIP Facility ensures that the Debtors will have sufficient funding to continue to operate uninterrupted in these chapter 11 cases as they work towards a sale of their assets or a stand-alone restructuring.  Further, as set forth in the Declaration of Mark Shapiro in support of this Motion, filed contemporaneously herewith, the terms of the DIP Facility are reasonable under the circumstances, and were the product of good faith, arm's length negotiations.

4.      The Debtors believe that approval of the DIP Facility will maximize the value of the Debtors' estates for the benefit of all stakeholders and is an exercise of sound business judgment.  Accordingly, the Debtors respectfully request that the Court approve the relief requested herein and enter an interim order substantially in the form of the Interim DIP Order attached hereto and a final order (the "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders").

### **Jurisdiction and Venue**

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and this is a core matter pursuant to 28 U.S.C. § 157(b).

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"),

4878-1562-0510

rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), and Section D of the Procedures for Complex Cases in the Northern

District of Texas (the "Complex Case Procedures").

## Background

8.      The Debtors provide pioneering software specifically geared towards

ophthalmology and optometry practices.   The Debtors' software, including iMedicWare

(ophthalmology) and My Vision Express (optometry), provides practice management, point of

sale, electronic health records, surgical scheduling, revenue cycle management, and reporting

solutions.  With over 5,000 physician and 2,000 practice clients representing an aggregate of over

25 million individual patients, the Debtors are one of the leading technology solutions providers

for eye care practices.

9.      On January 16, 2024 (the "Petition Date"), each Debtor filed a voluntary petition

for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' chapter

11 cases are being jointly administered.  No request for the appointment of a trustee or examiner

has been made in these chapter 11 cases, and no official committee has been appointed.

10.     A detailed description of the Debtors and their businesses, and the facts and

circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in the

*Declaration of Sophia Turrell, Chief Executive Officer, in Support of Chapter 11 Petitions and*

*First Day Motions* [Docket No. 14] (the "First Day Declaration").

4

## **Relief Requested**

11.     By this motion, the Debtors seek entry of the Interim DIP Order, and subsequently,

the Final DIP Order:

a.     Authorizing the Debtors to use the purported cash collateral of their Prepetition Lenders, in accordance with the terms and conditions set forth in the Interim DIP Order and in accordance with the Approved Budget and authority for the Debtors to grant adequate protection to the Prepetition Lenders with respect to any postpetition diminution in the value of their potential interests in their alleged Prepetition Collateral (as defined below) arising from, among other things, the Debtors' sale, use, or lease of the Prepetition Collateral and, subject to entry of the Final DIP Order, the priming of the alleged prepetition liens held by the Prepetition Lenders (as defined below) by the DIP Liens (as defined below);

b.     Subject and subordinate to the Carve Out (as defined below), granting replacement liens to the Prepetition Lenders, to the extent they have valid prepetition liens in the Prepetition Collateral;

c.     Authorizing the Debtors, as borrowers, to enter into a senior secured postpetition financing facility (the "DIP Facility") consisting of a superpriority debtor in possession credit facility pursuant to the terms and conditions of that certain Superpriority Secured Debtor in Possession Credit Facility Term Sheet (as amended or modified from time to time, the "DIP Term Sheet") among the Debtors and Create Capital, LLC (the "DIP Lender") attached to the Interim DIP Order as Exhibit 1, and which shall consist of a superpriority priming line of credit and term loan facility with an aggregate principal amount of up to $8.0 million from the DIP Lender as follows:

i.     *Interim Approval.* From the date of the Interim DIP Order until the date a Final DIP Order is entered (the "Interim Period")*,* approval to draw DIP Loans in the maximum amount of $1.3 million, subject to compliance with the terms, conditions, and covenants described in the DIP Term Sheet, the Interim DIP Order, and the Approved Budget (defined below); and

ii.     *Final Approval*.  Upon entry of the Final DIP Order, approval to draw DIP Loans in an amount up to $6.7 million, subject to compliance with the terms, conditions and covenants described in the DIP Loan Documents (defined below), the Final DIP Order and the Approved Budget;

d.     Authorizing the Debtors to execute and enter into the DIP Term Sheet and any other agreements, instruments, pledge agreements, guarantees, security

5

agreements, intellectual property security agreements, control agreements, notes and other documents reasonably required by the DIP Lender (collectively, and together with the Orders, the "DIP Loan Documents" and all obligations and indebtedness of any of the Debtors to the DIP Lender under the DIP Loan Documents (including, without limitation the DIP Loans), collectively, the "DIP Obligations") and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Loan Documents, including, but not limited to, granting or perfecting liens or security interests by any of the Debtors in favor of and for the benefit of the DIP Lender on account of the DIP Facility;

e.    Authorization and direction for the Debtors to use the proceeds of the DIP Facility as expressly provided in the DIP Loan Documents and in accordance with the Approved Budget;

f.    Authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Term Sheet and the DIP Loan Documents as such become earned, due and payable, including, but not limited to, the fees and costs of the DIP Lender's professionals, advisors, and consultants (collectively, the "DIP Lender Reimbursements");

g.    Granting to the DIP Lender allowed superpriority claims, subject to the Carve Out (as defined below), pursuant to section 364(c)(1) of the Bankruptcy Code payable from and having recourse to all assets of the Debtors;

h.    Granting to the DIP Lender (i) liens on all unencumbered prepetition and postpetition property of the Debtors and their respective estates and the proceeds thereof pursuant to section 364(c)(2) of the Bankruptcy Code including—subject to and effective upon entry of the Final DIP Order, and as a "last look" in the event the DIP Lender is not otherwise repaid in full— any Avoidance Proceeds (as defined below), (ii) for purposes of the Interim DIP Order only, a junior lien pursuant to 364(c)(3) of the Bankruptcy Code on the assets of Insight Software, LLC, Keymed, LLC, MD Office, LLC and MRX Holdings, LLC,[2] (iii), subject to entry of the Final DIP Order, priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition property of the Debtors' estates and all proceeds thereof, in each case of (i), (ii) and (iii) above, subject to the Carve Out and with the relative priorities set forth in the Interim DIP Order, and (iv) the right to lower the DIP Commitment in its sole discretion if the senior priming liens described in (c) above are not granted pursuant to the terms of the Final DIP Order;

---

[2] Insight Software, LLC, Keymed, LLC, MD Office, LLC and MRX Holdings, LLC are collectively referred to herein as the "Allegedly Encumbered Debtors."

4878-1562-0510

i.     Subject to entry of the Final DIP Order approving such relief, waiving (a) any equitable doctrine of marshaling and (b) the Debtors' right to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code;

j.     Authorizing the DIP Lender to terminate (a) all commitments to extend credit under the DIP Facility, and (b) to terminate the Debtors' sale, use, or lease of Cash Collateral or the proceeds of the DIP Facility, each upon the occurrence and continuance of an Event of Default (as defined below);

k.     Modifying the automatic stay of Bankruptcy Code section 362 (the "Automatic Stay") to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents, including the Interim DIP Order;

l.     Approving a waiver of any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness of the Interim DIP Order;

m.     Scheduling an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of the Interim DIP Order;

n.     Scheduling a final hearing (the "Final Hearing") such that the Final Order is entered no later than 35 days after the Petition Date to consider final approval of the DIP Facility; and

o.     Granting such other and further relief as is just and proper.

### Concise Statement Pursuant to Bankruptcy Rule 4001(b) and Section D of the Complex Case Procedures

**I.     Concise Statement regarding the DIP Facility.**

12.     The below chart contains a summary of the material terms of the proposed DIP Loan, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B), and Section D.10 and D.13 of the Complex Case Procedures.[3]

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Eye Care Leaders Portfolio Holdings, LLC and affiliated Debtors<br><br>*See* DIP Term Sheet at 1. |

---

[3] Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them in the DIP Term Sheet or the Interim DIP Order, as applicable.

4878-1562-0510

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | N/A |
| **DIP Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | Create Capital, LLC<br><br>*See* DIP Term Sheet at 1 |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | All DIP Obligations (as defined herein) will be due and payable in full in cash unless otherwise agreed to by the DIP Lender in writing on the earliest of: (i) July 31, 2024, (ii) if the Final DIP Order has not been entered, thirty-five days after the Petition Date, (iii) the acceleration of the DIP Loan and the termination of the DIP Commitments upon the occurrence of an event referred to below under "Termination", (iv) the effective date of any plan of reorganization, (v) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (vi) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases, (vii) the consummation of the sale of all or substantially all of the Borrowers' assets and (viii) the date an order is entered in any Bankruptcy Case appointing a Chapter 11 trustee or examiner with enlarged powers (any such date, the "DIP Termination Date").<br><br>*See* DIP Term Sheet at 2; Interim DIP Order ¶ 18. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B) | A senior secured superpriority priming debtor in possession non-amortizing facility (the "DIP Facility") comprised of a term loan in the principal amount of $8.0 million (the "DIP Commitment"), of which (i) $1.3 million(the "Interim Funding") will be available upon entry of an interim order by the Bankruptcy Court, in a form acceptable to the DIP Lender in all respects, approving the terms and conditions of the DIP Facility (the "Interim DIP Order") and (ii) the remaining $6.7 million will be available upon entry of a final order by the Bankruptcy Court, in a form acceptable to the DIP Lender in all respects, approving the DIP Facility on a final basis (the "Final DIP Order" and together with the Interim DIP Order the "DIP Orders").<br><br>The DIP Lender reserves the right, in its sole discretion, to reduce the DIP Commitment in the event priming liens are not granted as part of the Final DIP Order.<br><br>*See* DIP Term Sheet at 1–2 and n. 2 |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary conditions precedent for transactions of this type and others that are satisfactory to the DIP Lender, and in any event including, without limitation, the following:<br><br>• The DIP Lender shall have received a borrowing notice from the Borrowers at least one (1) business day prior to the requested date of funding.<br><br>• No Default or Event of Default shall have occurred, and shall be continuing, under the DIP Loan Documents immediately prior to the funding of the DIP Loan or would result from such borrowing of the DIP Loan.<br><br>• The making of the DIP Loan shall be authorized pursuant to the Interim DIP Order or the Final DIP Order, as applicable. |

4878-1562-0510

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | • The entry of the Interim DIP Order or Final DIP Order, as the case may be, in form and substance consistent with the terms and conditions set forth herein and otherwise satisfactory to the DIP Lender in its sole discretion, which Interim DIP Order or Final DIP Order, as the case may be, shall be in full force and effect, shall provide DIP Lender with lien priming all other liens, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Lender. <br><br> • Other than the Known Events, since the Petition Date, there shall not have been a Material Adverse Change; *provided that* Known Events and Material Adverse Change shall be defined in the DIP Credit Agreement. <br><br> • The Loan Parties shall be in compliance with (i) the Interim DIP Order or the Final DIP Order, as the case may be, and (ii) the Budget (subject to Permitted Variances). <br><br> *See* DIP Term Sheet at 7. |
| **Interest Rates** <br> Bankruptcy Rule 4001(c)(1)(B) | The DIP Loan will bear interest at a fixed rate per annum equal to 15%, accruing monthly, payable in arrears and payable in kind. <br><br> Interest shall be calculated on the basis of the actual number of days elapsed in a 360-day year. <br><br> After the occurrence and during the continuation of an Event of Default interest on the DIP Loans shall accrue at the Default Interest Rate, which shall be the Interest Rate **plus** 2.00% per annum. <br><br> *See* DIP Term Sheet at 4. |
| **Use of DIP Financing Facility and Cash Collateral** <br> **Bankruptcy Rule** 4001(b)(l)(B)(ii) | The DIP Loan shall be used solely in accordance with the Budget (including Permitted Variances (as defined below)) and the terms and conditions of the DIP Credit Agreement, and the DIP Orders, including (but subject to the Budget) to (i) provide working capital and for other general corporate purposes of the Debtors, (ii) fund the costs of the administration of the Chapter 11 Case (including US Trustee fees and professional fees and expenses) and the section 363 sale process, and (iii) fund interest, fees, and other payments contemplated in respect of the DIP Facility. The DIP Loan shall be funded in periodic installments, not more frequently than weekly, in amounts designed to coincide with the approved Budget and cash flow requirements forecasted therein. For the avoidance of doubt, the Borrowers understand and agree a permitted use shall be to pay the DIP Lender's reasonable costs. fees and expenses relating to the DIP Loan, which shall be paid as set forth in the DIP Facility Documents and the DIP Orders, <br><br> *See* DIP Term Sheet at 3; Interim DIP Order ¶ 10. |
| **Adequate Protection** <br> Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | The Debtors have agreed, despite the alleged deficiencies in the Prepetition Lender's Liens and the contention that the Prepetition Lenders' claims and liens may be subject to subordination and/or recharacterization, pursuant to Bankruptcy Code sections 361, 362, 363, and 364, to provide the Prepetition Lenders with adequate protection against any diminution in value of their interests in the Prepetition Collateral. |

4878-1562-0510

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | The Prepetition Lenders shall be granted, pursuant to Bankruptcy Code sections 361, 362, 363(c)(2), and 363(c)(3), replacement liens on the Prepetition Collateral to the same extent, validity and priority as existed prior to the Petition Date subject and subordinate only to (i) the DIP Liens and (ii) the Carve Out.<br><br>*See* Interim Order ¶¶ D.viii; 7. |
| **DIP Lender Liens and Superpriority Claims**<br>Bankruptcy Rule 4001(c)(1)(B() | All obligations of the Borrowers to the DIP Lender under the DIP Facility, including, without limitation, all principal and accrued interest, premiums (if any), costs, fees and expenses or any other amounts due (collectively, the "DIP Obligations"), shall be secured by the following liens and security interests (the "DIP Liens"):<br><br>a. subject to the Carve Out, pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority perfected senior priming lien on, and security interest in, substantially all of the assets of the Borrowers, wherever located, that may be subject to a validly perfected security interest in existence on the Petition Date;[4]<br><br>b. subject to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority perfected lien on, and security interest in, all present and after acquired property of the Debtors, wherever located, not subject to a lien or security interest on the date of commencement of the Chapter 11 Cases (collectively, the "Unencumbered Property");<br><br>c. subject to the Carve Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a junior perfected lien on, and security interest in, all present and after-acquired property of the Debtors, wherever located, that is subject to a Permitted Lien (as to be defined in the DIP Credit Agreement) on the Petition Date or subject to a Permitted Lien in existence on the Petition Date that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code; and<br><br>d. subject to the Carve Out, a first priority perfected lien on, and security interest in, all funds on deposit in the Controlled Accounts<br><br>All property set forth in (a) through (d) above is the "DIP Collateral."  Notwithstanding the foregoing, the DIP Collateral shall not include (and the DIP Liens shall not extend to) assets scheduled and held by the Debtors in trust (but only for so long as such assets are held in trust).<br><br>All DIP Claims shall be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having superpriority over any and all administrative expenses of the kind that are specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve Out.<br><br>The DIP Claims will, at all times during the period that the DIP Loan remains outstanding, remain, in right of payment, senior in priority to all other claims or administrative expenses, subject only to the Carve Out.<br><br>*See* DIP Term Sheet at 4–5; Interim DIP Order ¶¶ 5–6. |

---

[4] For purposes of the Interim DIP Order only, the DIP Lender will receive a junior lien pursuant to 364(c)(3) of the Bankruptcy Code on the assets of Insight Software, LLC, Keymed, LLC, MD Office, LLC and MRX Holdings, LLC. If the DIP Lender is not afforded a senior priming lien on the assets of these entities as part of the Final DIP Order, the DIP Lender reserves the right to lower the DIP Commitment in its sole discretion.

4878-1562-0510

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Repayment Features** Bankruptcy Rule 4001(c)(1)(B) | All or any portion of the DIP Loan may be voluntarily repaid at any time, without premium or penalty. Once repaid, DIP Proceeds cannot be reborrowed

*See* DIP Term Sheet at 4. |
| **Budget** Bankruptcy Rule 4001 (c)(1)(B) | *Approved Budget*. The "<u>Budget</u>" shall consist of a standard 13-week operating budget setting forth all forecasted receipts and disbursements on a weekly basis for such 13-week period beginning as of the week of the Petition Date, on a line item basis, including, among other things, expected draws under the DIP Facility, available cash, trade payables and ordinary course expenses, fees and expenses relating to the DIP Facility, fees and expenses related to the Chapter 11 Case (including US Trustee fees and professional fees), which Budget shall be in form and substance satisfactory to and approved by the DIP Lender. The Budget is attached to the Interim DIP Order as <u>Exhibit 2</u>. |
| **Variance Covenant** Bankruptcy Rule 4001I(l)(B) | *Permitted Variance*. The term "<u>Permitted Variances</u>" will mean, for the first full week period after the Closing Date, to be tested on the third business day of each week following the end of such week period (the "<u>Initial Testing Period</u>") and for the Applicable Rolling Period (as defined below) after the Initial Testing Period (each such period after the Initial Testing Period, together with the Initial Testing Period, the "<u>Testing Periods</u>"): (i) all favorable variances, and (ii) an unfavorable variance of no more than 10% for actual operating disbursements (on an aggregate basis), in each case as compared to the budgeted disbursements, respectively, set forth in the Budget with respect to the applicable Testing Period; notwithstanding the foregoing, Professional Fees shall be excluded from the determination of Permitted Variances. The Permitted Variances with respect to each Testing Period shall be determined and reported to the DIP Lender not later than 5:00 p.m. Central Time on the third business day of each week immediately following the end of each such Testing Period. Additional variances, if any, from the Budget, and any proposed changes to the Budget, shall be subject to the approval of the DIP Lender. Variances will be reported on a cumulative basis matching the relevant Applicable Rolling Period in a format replicating the Budget and will include explanation of variances (including whether they are permanent or temporal in nature). Variances will be carried over across Applicable Rolling Periods solely to the extent they are permanent in nature. "<u>Applicable Rolling Period</u>" means, (i) for the Initial Testing Period, the most recently completed calendar week, (ii) for the second Testing Period after the Closing Date, the most recently completed two calendar weeks, (iii) for the third Testing Period after the Closing Date, the most recently completed three calendar weeks and (iv) for each Testing Period thereafter, the most recently completed four calendar weeks.

*See* DIP Term Sheet at 2–3, 8–9; *see also* DIP Term Sheet at 9–10 for financial and other reporting requirements; Interim DIP Order ¶¶ 4, 22. |
| **Events of Default** Bankruptcy Rule 4001(c)(l)(B) | Usual and customary for financings of this type including, but not limited to, failure to obtain entry of the Interim DIP Order, as well as failure to achieve the Milestones. In addition, it will be an Event of Default if two or more members of the Executive Management Team resign or otherwise terminate their employment relationship with the Debtor. The term "<u>Executive Management Team</u>" shall be defined in the DIP Facility Documents as including the C-Suite executives and such other key employees as the Debtor may expressly identify.

*See* DIP Term Sheet at 11–12; Interim DIP Order ¶ 20. |

4878-1562-0510

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Indemnification**<br>Bankruptcy Rule<br>4001(c)(1)(B)(ix) | *Indemnification.* The DIP Lender shall have no liability to any third party and shall not be deemed to be in control of the operations of Debtors, or to be acting as a "responsible person" or managing agent with respect to the operation or management of the Debtors. The Debtors shall indemnify and hold harmless the DIP Lender and their respective affiliates and officers, directors, employees, agents, and advisors to the extent set forth in the DIP Term Sheet.<br><br>*See* DIP Term Sheet at 15-15; Interim DIP Order ¶ 27. |
| **Carve Out**<br>Bankruptcy Rule<br>4001(c)(1)(B) | The Interim Order provides a "Carve Out" of certain statutory fees, allowed professional fees of the Debtors, and say official committee of unsecured creditors appointed under section 1102 of the Bankruptcy Code appointed in the chapter 11 cases pursuant to section 1103 of the Bankruptcy Code, including a Post-Carve Out Trigger Notice Cap, all as detailed in the DIP Term Sheet and the Interim Order.<br><br>*See* DIP Term Sheet at 6-7; Interim DIP Order ¶ 8. |
| **Fees and Expenses**<br>Bankruptcy Rule<br>4001(c)(1)(B) | An origination fee of $300,000 ("Origination Fee"), which shall be earned and payable upon entry of the Interim DIP Order, and payable by the Debtors to the DIP Lender immediately upon the delivery of the Interim Funding after the Closing Date.  For the avoidance of doubt, the payment of the fee will be in the form of an offset to the Interim Funding amount such that the DIP Lender will retain $300,000 of the $1,300,000 of Interim Funding in satisfaction of the obligation.<br><br>A closing fee equal to $200,000 (the "Closing Fee"), which shall be earned upon entry of the Interim DIP Order, and payable upon the earlier of (i) the DIP Termination Date, or (ii) the closing of a sale following entry of a Sale Order (as defined below); *provided, however,* that no Closing Fee shall be payable if the DIP Lender is the successful bidder for the Debtors' assets.<br><br>The Borrowers shall jointly and severally pay (i) (x) all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the DIP Lender (including, but limited in the case of counsel, to all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the DIP Lender's counsels, and any successor counsel to each), in each case in connection with the negotiations, preparation, execution and delivery of the DIP Loan Documents and the funding of all DIP Loan under the DIP Facility, including, without limitation, all due diligence, transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the DIP Lender and its counsel and professional advisors in connection with the DIP Facility, the DIP Loan Documents or the transactions contemplated thereby, the administration of the DIP Facility and any amendment or waiver of any provision of the DIP Loan Documents, and (ii) without duplication, all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the DIP Lender (including, but limited in the case of counsels, to all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of outside counsels to the DIP Lender (and any successor counsel), and, to the extent necessary, one firm of local counsel engaged by the DIP Lender in each relevant jurisdiction, and any successor counsel to such primary counsel and local counsel, in each case in connection with (A) the enforcement of any rights and remedies under the DIP Loan Documents, (B) the Chapter 11 Cases, including attendance at all hearings in respect of the Chapter 11 Cases; and (C) defending and prosecuting any actions or proceedings arising out of or relating to the DIP Obligations, the Liens securing the DIP Obligations, |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | or any transaction related to or arising in connection with the DIP Credit Agreement or the other DIP Loan Documents (collectively, the "DIP Lender Reimbursements"). <br><br> *See* DIP Term Sheet at 4, 14; Interim DIP Order ¶¶ 2.c, 25. |
| **506(c) Waiver** <br> Bankruptcy Rule 4001(c)(l)(B)(x) | Effective upon entry of the Final DIP Order, the DIP Lender shall not be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral and all proceeds shall be received and applied pursuant to the Final DIP Order and the DIP Loan Documents notwithstanding any other agreement or provision to the contrary. <br><br> Effective upon entry of the Final DIP Order, the Debtors (on behalf of themselves and their estates) shall waive, and shall not assert in the Chapter 11 Cases or any successor cases, any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender, upon the DIP Collateral <br><br> *See* DIP Term Sheet at 13-14; Interim DIP Order ¶ 9. |
| **Section 552(b)** <br> Bankruptcy Rule 4001(c)(l)(B) | N/A |
| **Liens on Avoidance Actions/Proceeds** <br> Bankruptcy Rule 4001(c)(1)(B)(xi) | Subject to entry of Final Order, the DIP Lender shall have a lien on the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code; *provided*, *however* the DIP Lender shall only avail itself of proceeds from avoidance actions, on a "last look" basis, and only if all other Collateral is inadequate to indefeasibly repay the DIP Obligations in full. <br><br> *See* DIP Term Sheet at 5; Interim DIP Order ¶ 6.c. |
| **Stipulations to Prepetition Liens and Claims** <br> Bankruptcy Rule 4001(c)(1)(B)(iii) | N/A |
| **Milestones** <br> Bankruptcy Rule 4001(c)(1)(B) | • No later than seven (7) days after the filing of this Motion, the Bankruptcy Court shall have entered the Interim DIP Order. <br><br> • No later than fourteen (14) days after the Petition Date, the Debtors shall file with the Bankruptcy Court a motion (the "Bid Procedures Motion") to approve procedures for the marketing and sale of the Debtors' assets (the "Bid Procedures Motion") in form and substance reasonably acceptable to the DIP Lender. <br><br> • No later than twenty-one (21) days after the Bid Procedures Motion is filed, the Bankruptcy Court shall have entered an order approving the same (the "Bid Procedures Order"). The Bid Procedures Order and applicable bid procedures shall, consistent with this Term Sheet, authorize and approve the DIP Lender's credit bid of the DIP Obligations, in whole or in part, pursuant to Section 363(k) of the Bankruptcy Code, for any or all of the Debtors' assets; |

4878-1562-0510

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | • Not later than 30 days after entry of the Bid Procedures Order, the Bankruptcy Court shall have entered an order approving one or more sales of the Debtors' assets (the "Sale Order"); and<br><br>• No later than thirty-five days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order.<br><br>*See* DIP Term Sheet at 10–11; Interim Order ¶ 19. |
| **Challenge Period**<br><br>Bankruptcy Rule 4001(c)(l)(B) | N/A |
| **Waiver/Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The DIP Lender shall have customary remedies upon the occurrence and during the continuance of an Event of Default, including, without limitation, the following:<br><br>Without further order from the Bankruptcy Court, and subject to the terms of the Interim Order and the Final DIP Order (including in respect of any required notices), the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuance of any Event of Default under their respective DIP Loan Documents, all rights and remedies provided for in the DIP Loan Documents, and to take any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable): (a) immediately terminate the Debtors' limited use of any cash collateral; (b) cease making any DIP Loan under the DIP Facility to the Debtors; (c) declare all DIP Obligations to be immediately due and payable; (d) freeze monies or balances in the Debtors' accounts (and, with respect to the DIP Credit Agreement and the DIP Facility, sweep all funds contained in the Controlled Accounts); (e) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Lender against the DIP Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable DIP Lender, including, without limitation, disposition of the DIP Collateral solely for application towards the DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted under the Interim Order and the Final DIP Order, the DIP Loan Documents or applicable law to effect the repayment of the DIP Obligations; provided, however, that the DIP Lender must provide the Debtors, the U.S. Trustee and any official committee with five (5) calendar days' written notice (which may be by email) and file such notice of the Docket of the Chapter 11 Cases before exercising any enforcement rights or remedies; provided, further, that neither the Debtors, any statutory committee nor any other party-in-interest shall have the right to contest the enforcement of the remedies set forth in the Interim Order and the Final DIP Order and the DIP Loan Documents, other than to argue that an Event of Default and/or a Termination Date has not occurred.<br><br>The Debtors shall waive any right, without the prior written consent of the DIP Lender, to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Lender set forth in the Interim Order and the Final DIP Order and in the DIP Loan Documents.<br><br>*See* DIP Term Sheet at 12–13; Interim Order ¶ 21. |

## The Debtors' Prepetition Purported Secured Debt

13.     Between 2014 and 2017, certain of the Debtors entered into allegedly secured term

loan agreements (collectively, the "Prepetition Term Loans") with various entities related to GHTG

Investment, LLC (collectively, the "Prepetition Lenders") for the purpose of acquiring certain

other Debtor entities.  Each Prepetition Term Loan, if truly debt, is due at maturity, bears interest

at rates of 5–5.50% per annum and matures in either June 2029 or December 2029.  As of the

Petition Date, the purported outstanding aggregate principal and interest due under the Prepetition

Term Loans is approximately $118 million.  The Debtors have no other long-term debt obligations.

14.     Certain of the Prepetition Term Loans are purportedly secured by the membership

interests and books and records of the borrowing and acquired entities, and all proceeds, supporting

obligations, and products of the foregoing.  Certain others are purportedly secured by substantially

all of the borrowers' assets.  However, as discussed more fully below, the relevant Prepetition

Lenders do not appear to be fully perfected.  A chart listing each Prepetition Term Loan is attached

to the First Day Declaration as Exhibit C.

15.     The Prepetition Term Loan documents generally attempt to grant security interests

to the Prepetition Lenders in substantially all of certain Debtors' assets.  However, putting aside

any other infirmities in the claims, lien grants or the UCC-1 financing statements, the Prepetition

Lenders have not properly perfected their liens in the Debtors' cash because the Prepetition

Lenders do not "control" the deposit accounts:  (a) there are no deposit account control agreements

("DACAs") in place with respect to any of the Debtors and (b) the Prepetition Lenders are not

banks and, thus, there are no deposit accounts residing at any of the Prepetition Lenders in which

the Debtors deposit cash.  Further lien and perfection (imperfection) issues are present as well

because for certain of the Debtors, no UCC-1 financing statement was filed at all, and in other

instances, UCC-1 financing statements extend only to a pledge of the stock/membership interests in certain subsidiaries and not to any assets of the borrower or the subsidiary in question.

16.    Attached as **Exhibit B** hereto is a chart showing, among other things, which Debtors have financing statements filed against them, and the scope of the collateral set forth in the applicable UCC-1 financing statement.  Entries in ==yellow highlights== indicate that an "all asset" UCC-1 financing statement was field with respect to the Debtor in question.  Entries in ==green highlights== indicate that a filed all asset UCC-1 financing statement has expired and not been continued.  The one entry in in ==blue highlight== indicates a UCC-1 financing statement filed by an unrelated third-party equipment financier, which the Debtors do not seek to prime or otherwise disturb.[5]  Again, however, there are no DACAs in place for any of the Debtors' deposit accounts, and deposit accounts are not held at or by any of the Prepetition Lenders, thereby rendering the Prepetition Lenders unperfected and unsecured as to the Debtors' cash and bank accounts.  *See, e.g.*, N.C. GEN. STAT. §§ 25-9-104(a) (setting forth how a secured party has "control" over a deposit account"); 25-9-203(b)(3)(d) (providing that a secured lender must have "control" over a deposit account as a required element of an enforceable security interest);  FLA. STAT. §§ 679.1041(setting forth how a secured party has "control" of a deposit account); 679.2031(2)(c)(4) (providing that a secured lender must have "control" over a deposit account as a required element of an enforceable security interest).

17.    As a consequence, because the Prepetition Lenders do not have a properly perfected lien on the Debtors' cash—and thus cannot meet their burden of proof under section 363(p) of the Bankruptcy Code—they are not entitled to adequate protection for the Debtors' postpetition use of

---

[5] Exhibit B is a summary only, provided for the convenience of the Court and parties in interest.  Nothing in Exhibit B is intended to be, nor shall it in any way be deemed to be, a waiver or an admission by the Debtors of any matter of fact or law.  The Debtors reserve all rights with respect to the Prepetition Lenders and their respective liens and claims in every way.

4878-1562-0510

cash.  Out of an abundance of caution, however, the Debtors nonetheless seek to provide the

Prepetition Lenders with replacement liens as adequate protection on an interim basis, pending

entry of the Final DIP Order and a determination by the Court as to the validity, priority and extent

of their alleged liens on the Debtors' cash and other assets (collectively, the "Prepetition

Collateral").

18.     Further, the Prepetition Lenders are all insiders of Global Growth Holdings, Inc.

("Global Growth") and its affiliates (including the individual behind Global Growth, Greg

Lindberg), the private equity firm that was the prior indirect owner of the Debtors before the

Debtors were transferred into an irrevocable trust on or about July 22, 2021, called the "ECL

Trust."  The ECL Trust, since its formation, has been the sole member of Eye Care Leaders

Holdings Portfolio, LLC ("HoldCo"), the Debtors' ultimate parent, as set forth in HoldCo's

Amended and Restated Operating Agreement also dated July 22, 2021.

19.     As a result of this insider relationship, and the multiple proceedings and allegations

against Global Growth, Mr. Lindberg and various affiliates,[6] the Debtors believe that the claims

---

[6] *See, e.g.*, *PB Life & Annuity Co., Ltd. v. Lindberg, et al.*, Adv. No. 23-01000 (LGB) (Bankr. S.D.N.Y.); *United States v. Lindberg, et al.*, Case No. 5:19-cr-22-MOC-DSC (W.D.N.C.); *United States v. Lindberg*, 3:23-cr-48-MOC (W.D.N.C.); *see also Southland Nat'l Ins. Corp. v. Lindberg*, 289 N.C. App. 378, 381, 889 S.E.2d 512, 516 (2023), writ allowed, 894 S.E.2d 747 (N.C. 2023) and review allowed in part, denied in part, 894 S.E.2d 748 (N.C. 2023); *see also* https://www.justice.gov/opa/pr/former-insurance-executive-indicted-2b-fraud-scheme (last visited on Jan. 18, 2024) (" 'The indictment reveals a carefully orchestrated scheme that relied on a web of complex financial investments and transactions designed to evade regulators, disguise the financial health of Lindberg's insurance companies, and conceal the alleged purpose of the scheme: Lindberg's personal gain,' said U.S. Attorney Dena J. King for the Western District of North Carolina. 'My office will continue to work with our law enforcement partners to investigate and prosecute financial wrongdoing and hold perpetrators accountable for their actions' "); https://www.justice.gov/criminal/criminal-vns/case/united-states-v-greg-e-lindberg (last visited on Jan. 18, 2024) ("According to court documents, from no later than 2016 through at least 2019, Lindberg and others allegedly conspired and schemed to defraud various insurance companies, other third parties, and ultimately thousands of insurance policyholders. Lindberg allegedly deceived the North Carolina Department of Insurance and other regulators, evaded regulatory requirements meant to protect policyholders, concealed the true financial condition of his insurance companies, and improperly used insurance company funds for his personal benefit. In particular, the indictment alleges that Lindberg personally benefitted from the fraud in part by using insurance company funds to finance his lavish lifestyle, including the purchase and refinancing of personal real estate and 'forgiving' more than $125 million in loans from his affiliated companies to himself to fund his personal expenses").

and liens allegedly held by the Prepetition Lenders are subject to recharacterization and/or equitable subordination. The Debtors expect to bring those issues to the Court for determination in short order.[7]

### The DIP Facility

**I.      The Debtors' Need for Access to Financing and Use of Cash.**

20.      As described in the First Day Declaration, the Debtors require immediate access to cash and financing under the DIP Facility to ensure they can continue operating during these chapter 11 cases and preserve the value of their estates for the benefit of all parties in interest. Without immediate postpetition financing and access to cash, the Debtors will be unable to continue paying wages to their employees, paying vendors for equipment and services, meeting working capital and business operating needs, preserving and maximizing the value of their estates, and administering these chapter 11 cases, all of which will cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders. Moreover, sufficient post-petition financing is necessary to send a strong market signal that these chapter 11 cases are well-funded and that the Debtors will continue to operate without disruption while they are reorganizing. Otherwise, customers may seek alternative products and services, and vendors and suppliers may refuse to do business with the Debtors, which is a value *destructive* proposition.

21.      As set forth in the Approved Budget, to ensure such liquidity, the Debtors seek authorization to utilize cash and draw $1.3 million on an interim basis ($300,000 of which will be retained by the DIP Lender as its origination fee, as set forth in the DIP Term Sheet and the "material terms" chart above), and an aggregate of up to $8.0 million in on a final basis upon entry

---

[7] In that regard, it is also worth noting that there appear to be other defects in the liens allegedly held by the Prepetition Lenders. As set forth previously, the Debtors reserve all rights with respect to the Prepetition Lenders' claims and liens.

of the Final DIP Order.[8]  The Debtors believe the DIP Facility is essential to preserve and maximize the value of their estates, and responsibly administer these chapter 11 cases.

**A.  Alternative Sources of Financing Are Not Available on Better Terms.**

22.    The Debtors engaged B. Riley Advisory as their financial advisor in mid-to-late December 2023 to provide financial advisory services, which services include exploring financing options to address the Debtors' liquidity constraints.  To that end, as described more fully in the Shapiro Declaration, during the prepetition period, B. Riley Advisory contacted approximately 58 sources for a potential DIP loan and/or to serve as a potential buyer of the Debtors' assets, comprised of 22 strategics in the industry (who could serve as a potential stalking horse bidder for the Debtors' assets, a DIP lender, or both) as well as 36 more traditional non-strategic sources of financing.  Approximately 34 entities signed a nondisclosure agreement and were provided access to a confidential data room.  Of those entities, to date, only one—the DIP Lender—presented any proposal that was a realistic or actionable proposal under the Debtors' timing and under the present circumstances.  Shapiro Decl.¶ 15.

23.    As a consequence, and given time and liquidity constraints, the Debtors determined that the DIP Facility was the best financing alternative available under the circumstances because, among other things, it: (i) provides sufficient financing to meet the Debtors' liquidity needs; and (ii) allows the Debtors to immediately work towards either a stand-alone restructuring or a sale of their assets, in either or both cases, maximizing value for all constituents.[9]

---

[8] If the DIP Lender is denied priming liens on the assets of the Allegedly Encumbered Debtors, the aggregate amount of the DIP Commitment may be reduced, at the DIP Lender's sole discretion.

[9] That said, between the time of the Interim Hearing and Final Hearing, B. Riley will continue to "shop the DIP" to ensure that the Debtors ultimately seek final approval of the best and most favorable financing terms available. Shapiro Decl. ¶15.

4878-1562-0510

24.    The Debtors would further demonstrate that the terms of the DIP Facility are fair, reasonable and appropriate under the circumstances and are in accordance with current market terms and further, that the DIP Facility is fair, reasonable, an exercise of sound business judgment, and necessary to avoid irreparable harm during the course of these Chapter 11 Cases.  Further, as set forth in Shapiro Declaration, the Milestones contained in the DIP Financing, although slightly tight, are nonetheless reasonable and achievable, and will assist in expending the Debtors' emergence from chapter 11.  Shapiro Decl. ¶ 18.

<u>**Basis for Relief**</u>

**I.      The Debtors Should Be Authorized to Obtain Postpetition Financing.**

**A.      Entry into the DIP Term Sheet and DIP Loan Documents Is an Exercise of the Debtors' Sound Business Judgment.**

25.    The Court should authorize the Debtors to enter into the DIP Term Sheet and other DIP Loan Documents, obtain access to the DIP Facility, and continue using cash.  Courts grant a debtor in possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

26.     Specifically, to determine whether the business judgment standard is met, a court

need only "examine whether a reasonable business person would make a similar decision under

similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re*

*Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not

second guess a debtor's business decision when that decision involves "a business judgment made

in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the

[Bankruptcy] Code").

27.     Furthermore, in considering whether the terms of postpetition financing are fair and

reasonable, courts consider the terms in light of the relative circumstances of both the debtor and

the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003)

(while many of the terms favored the DIP lenders, "taken in context, and considering the relative

circumstances of the parties," the court found them to be reasonable); *see also Unsecured*

*Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil*

*Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into

"hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take

into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.

For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern District of

New York held that:

> Although all parties, including the Debtors and the Committee, are naturally
> motivated to obtain financing on the best possible terms, a business decision
> to obtain credit from a particular lender is almost never based purely on
> economic terms.  ***Relevant features of the financing must be evaluated,***
> ***including non economic elements such as the timing and certainty of***
> ***closing, the impact on creditor constituencies and the likelihood of a***
> ***successful reorganization.***  This is particularly true in a bankruptcy setting
> where cooperation and establishing alliances with creditor groups can be a
> vital part of building support for a restructuring that ultimately may lead to
> a confirmable reorganization plan.  That which helps foster consensus may

> be preferable to a notionally better transaction that carries the risk of
> promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

28.      The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment.  The DIP Facility will allow the Debtors to:  (a) fund capital expenditures that are essential to the Debtors' continuation as a going concern; (b) provide the liquidity necessary to continue favorable trade terms with vendors and to reassure other stakeholders; (c) fund payroll obligations; (d) fund the administrative cost of these chapter 11 cases; and (e) provide a path to a stand-alone restructuring or a sale of assets, or a combination of the two.  The Debtors negotiated the DIP Term Sheet with the DIP Lender in good faith, at arm's length, and with the assistance of their respective advisors, and the Debtors believe that they have obtained the best financing available under the circumstances.

**B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

29.      The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth herein and in the DIP Term Sheet pursuant to sections 364(c) and (d) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Lender postpetition security interest in and liens on the DIP Collateral (as defined in the Interim Order) that are valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of the Interim DIP Order; *provided that* pending entry of the Final DIP Order, the DIP Lenders' liens on the assets of the Allegedly Encumbered Debtors shall be junior liens pursuant to section 364(c)(3).

30.      The above-described liens on encumbered and unencumbered assets are common features of postpetition financing facilities, and as set forth in greater detail in the Shapiro Declaration, Shapiro Decl. ¶¶ 11, 12, were a necessary feature here to provide security for the

4878-1562-0510

proposed financing. The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

    a.  the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

    b.  the credit transaction is necessary to preserve the assets of the estate; and

    c.  the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re L.A. Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

31.    As described above and as set forth in the Shapiro Declaration, no third-party lender was willing to provide postpetition DIP financing on an unsecured, *pari passu*, or junior-lien basis, other than the DIP Lender as set forth herein, in the DIP Term Sheet and in the form of Interim DIP Order. *See* Shapiro Decl. ¶¶ 10, 17.

32.    Absent the DIP Facility, which will provide assurances that the Debtors will have sufficient liquidity to administer these chapter 11 cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders. *See* Shapiro Decl. ¶ 10. Without postpetition financing, the Debtors lack sufficient funds to operate their enterprise for anything

4878-1562-0510

other than a short-term basis, continue paying their debts as they come due, and cover the projected costs of these chapter 11 cases. *See* Shapiro Decl. ¶¶ 10, 17. Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Term Sheet, are reasonable as more fully set forth above and in the Shapiro Declaration. For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

33. In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien." As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving a superpriority claim in favor of the DIP Lender is reasonable and appropriate.

34. Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). The Debtors may incur "priming" liens under the DIP Facility if either (a) the prepetition lender has consented or (b) the prepetition lender's interests in collateral are adequately protected. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

35.     Here, the Prepetition Lenders have not agreed to priming.  Consequently, as stated above, for purposes of the Interim DIP Order only, the DIP Lender has agreed to take a junior lien on the assets of the Allegedly Encumbered Debtors, pending the Final Hearing.  At the Final Hearing, if the matter is not resolved in advance, the Debtors will seek to prime the Prepetition Lenders for several reasons including that (i) the Prepetition Lenders do not have a perfected lien on cash and cannot meet their burden to prove the same; and (ii) there appear to be valid bases to recharacterize and/or subordinate the alleged liens and claims of the Prepetition Lenders.  .  In the event the DIP Lender is not granted a senior priming liens on the assets of the Allegedly Encumbered Debtors as part of the Final DIP Order, the DIP Lender reserves the right to lower the DIP Commitment in its sole discretion.

36.     In the interim, the Debtors respectfully submit that providing the Prepetition Lenders with replacement liens on the Prepetition Collateral should be more than sufficient adequate protection pending the Final Hearing.

C.     **No Comparable Alternative to the DIP Facility Are Reasonably Available on More Favorable Overall Terms.**

37.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by

25

establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

38.     As noted above, the Debtors do not believe that a more favorable alternative DIP financing is reasonably available, making DIP Facility the most favorable to the Debtors under the circumstances.  The DIP Facility provide the Debtors with the liquidity they need at the lowest cost available while simultaneously placing the Debtors on an optimal path for a successful restructuring.  Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**II.     The Debtors Should Be Authorized to Use Cash.**

39.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use cash collateral with the consent of the secured party.  Here, as stated above, the Debtors' cash is not "cash collateral" because the Prepetition Lenders are not perfected in the Debtors' deposit accounts.

40.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g.*, *In re First South Sav. Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987) (explaining that adequate protection depends on the facts and circumstances of the case);

26

4878-1562-0510

*In re Las Torres Dev., LLC*, 413 B.R. 687, 697 (Bankr. S.D. Tex. 2009) ("[I]n determining whether a secured creditor's interest is adequately protected, most courts engage in an analysis of the property's 'equity cushion'—the value of the property after deducting the claim of the creditor seeking relief from the automatic stay and all senior claims.") (internal quotes and citations omitted); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).  The concept of adequate protection is designed to shield a secured creditor from diminution in the value of its interest in collateral during the period of a debtor's use.  *See In re Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral."); *see also In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180—81 (Bankr. D. Del. 1993) (holding that adequate protection for use of collateral under section 363 of the Bankruptcy Code is limited to use-based decline in value).

### A.    Adequate Protection Provided to the Prepetition Lenders.

41.    As described more fully above in the summary, and as set forth in the form of Interim DIP Order, the Debtors propose to provide the Prepetition Lenders with replacement liens on the Prepetition Collateral pending a determination of the validity, scope and extent of their liens and claims.

42.    The Debtors submit that this adequate protection is sufficient, at least on an interim basis, to protect the Prepetition Lenders from any potential diminution in value to their purported collateral, subject to revisiting the adequate protection issue at the Final Hearing as necessary.

4878-1562-0510

**III.     The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lender Under the DIP Loan Documents.**

43.     Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain the reasonable fees and expenses of the DIP Lender.  Courts in this district and others have approved the payment of similar fees in large or complex chapter 11 cases.  *See*, *e.g.*, *In re Ebix, Inc.*, No. 23-80004 (SWE) (Bankr. N.D. Tex. Dec. 19, 2023) [Docket No. 64, ¶¶ 4(b), (c)] (approving upfront and exit fees of 3% and 2% of committed amount, respectively); *In re Tuesday Morning*, No. 23-90001 (ELM) (Bankr. N.D. Tex. Feb. 16, 2023) [Docket No. 112 ¶ 66]; *In re Studio Movie Grill Holdings, LLC*, No. 20-32633 (SGJ) (Bankr. N.D. Tex. Oct. 27, 2020) [Docket No. 52, ¶ 65] (approving among other fees exit fees in the amount of 2.0 percent); *In re Tuesday Morning Corp.*, No. 20-31476 (HDH) (Bankr. N.D. Tex. May 28, 2020) [Docket No. 35, ¶ 71 ] (approving an upfront fee of 2.0 percent to the DIP Facility); *In re GGI Holdings, LLC*, No. 20-31818 (HDH) (Bankr. N.D. Tex. May 7, 2020) [Docket No. 63, ¶¶ 5(iv), 6(iii)].

44.     It is understood and agreed by all parties, that these fees are an integral component of the overall terms of the DIP Facility and were required by the DIP Lender as consideration for the extension of postpetition financing.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Loan Documents in connection with entering into those agreements.

**IV.     The DIP Lender Should Be Deemed A Good-Faith Lender Under Section 364(e).**

45.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

4878-1562-0510

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

46.    As explained herein, in the Shapiro Declaration, and in the First Day Declaration, the DIP Loan Documents are the result of: (a) the Debtors' reasonable and informed determination that the DIP Lender provided the best postpetition financing alternative available under the circumstances and (b) extended arm's length, good-faith negotiations between the Debtors and the DIP Lender.  The Debtors submit that the terms and conditions of the DIP Loan Documents are reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein.  Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.    The Automatic Stay Should Be Modified on a Limited Basis.**

47.    The form of Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lender to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim DIP Order.  The proposed Interim DIP Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant liens to the DIP Lender and to incur all liabilities and obligations set forth in the Interim DIP Order.  Finally, the form of Interim DIP Order provides that, following the occurrence of an Event of Default (as defined in Paragraph 20 of the Interim

4878-1562-0510

DIP Order) and an appropriate opportunity for the Debtors to obtain relief from the Court, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Lender to exercise all rights and remedies in accordance with the DIP Loan Documents, or applicable law.

48.     Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re Tuesday Morning Corp.*, No. 20-31476 (HDH) (Bankr. N.D. Tex. July 10, 2020) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Taco Bueno Restaurants, Inc.*, No. 18-33678 (SGJ) (Bankr. N.D. Tex. Nov. 30, 2018) (same).  These provisions are also consistent with the Complex Case Procedures.

## VI.    Failure to Obtain Immediate Interim Access to the DIP Facility and Use of Cash Would Cause Immediate and Irreparable Harm.

49.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

50.     For the reasons noted above, the Debtors have an immediate postpetition need to use cash on hand, and access the liquidity provided by the DIP Facility.  The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to cash.  The Debtors will use cash, among other things, to fund the operation of their business, maintain business relationships with their vendors and suppliers, make payroll, and satisfy other essential working capital and operational needs, all of which are required to preserve and maintain

4878-1562-0510

the Debtors' going concern value for the benefit of all parties in interest, and to fund the administration of these chapter 11 cases.  In short, the Debtors' ability to administer these chapter 11 cases through the use of cash (to the extent it might be "cash collateral") is vital to preserve and maximize the value of the Debtors' estates.

51.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim DIP Order authorizing the Debtors, from and after entry of the Interim DIP Order until the Final Hearing, to receive initial funding under the DIP Facility.  The Debtors require the initial funding under the DIP Facility prior to the Final Hearing and entry of the Final DIP Order to continue operating, in the normal course, pay their administrative expenses, and to otherwise implement the relief requested in the Debtors' first day motions.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## **Request for Final Hearing**

52.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event later than 35 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

53.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## **Notice**

54.     The Debtors will provide notice of this Motion to the following parties or their counsel: (a) the U.S. Trustee for the Northern District of Texas; (b) the holders of the 30 largest

31

unsecured claims against the Debtors (on a consolidated basis); (c) the agent to the Prepetition Lenders; (d) the United States Attorney's Office for the Northern District of Texas; (e) the Internal Revenue Service; (f) the state attorneys general for states in which the Debtors conduct business; (g) the banks at which the Debtors maintain their deposit accounts; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is needed.

## No Prior Request

55.    No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an interim order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Respectfully submitted this 23rd day of January, 2024.

**GRAY REED**

By:  */s/ Jason S. Brookner*
_____
Jason S. Brookner
Texas Bar No. 24033684
Amber M. Carson
Texas Bar No. 24075610
Emily F. Shanks
Texas Bar No. 24110350
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:    (214) 954-4135
Facsimile:    (214) 953-1332
Email:        jbrookner@grayreed.com
              acarson@grayreed.com
              eshanks@grayreed.com
*Proposed Counsel to the Debtors*
*and Debtors in Possession*

4878-1562-0510

<u>**Certificate of Service**</u>

I certify that on January 23, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Jason S. Brookner*
Jason S. Brookner

4878-1562-0510

**<u>Exhibit A</u>**

**Proposed Interim DIP Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| EYE CARE LEADERS PORTFOLIO | § | Case No. 24-80001(MVL) |
| HOLDINGS, LLC, *et al.*,[1] | § | |
| | § | (Jointly Administered) |
| Debtors. | § | |
| | § | |

**INTERIM ORDER (I) AUTHORIZING THE**
**DEBTORS TO (A) OBTAIN POSTPETITION FINANCING**
**AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS AND**
**SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING**
**ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY,**
**(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtors' federal tax identification number are as follows:  ECL PH Services Group LLC (6746); Eye Care Leaders Portfolio Holdings, LLC (0576); Alta Billing Holdings, LLC (4944); Alta Billing, LLC (4823); Canta Health, LLC (7791); DJRTC, LLC (N/A); ECL Group, LLC (9195); ECL Holdings, LLC (8888); Eye Care Leaders Holdings, LLC (1701); iMedicWare, Inc. (6251); IMW EMR, LLC (6421); IMW Holdings, LLC (3980); Insight Software, LLC (8321); Integrity EMR Holdings, LLC (3877); Integrity EMR, LLC (3716); IO Practiceware, Inc. (4507); IOPW Holdings, LLC (0461); IOPW, LLC (N/A); Keymed Holdings, LLC (0301); Keymed, LLC (9379); MD Office, LLC (9075); MDO Group Holdings, LLC (0435); MDX, LLC (5074); Medflow Holdings, LLC (7716); Medflow, Inc. (N/A); MNI Holdings, LLC (7633); MRX Holdings, LLC (N/A); My Vision Express, Inc. (N/A); Penn Medical Informatics Systems, LLC (4584); PI Software Holdings, LLC (N/A); PI Software, LLC (N/A); PMX, LLC (N/A); Revenue Health Solutions, LLC (7025); RHS Holdings, LLC (N/A); The Hoehne Group – Software Division, Inc. (7788).  The Debtors' principal offices are located at 555 S. Mangum Street, Suite 100, Durham, NC 27701.

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of interim and final orders pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Section D of the Procedures for Complex Cases in the Northern District of Texas (the "Complex Case Procedures") seeking, among other things:

a.      entry of an interim order (this "Interim DIP Order") and subsequently, a final order (the "Final DIP Order"):

(i)      Authorizing the Debtors to use the purported cash collateral of their Prepetition Lenders, in accordance with the terms and conditions set forth in the Interim DIP Order and in accordance with the Approved Budget and authority for the Debtors to grant adequate protection to the Prepetition Lender with respect to any postpetition diminution in the value of their potential interests in the Prepetition Collateral (as defined below) arising from, among other things, the Debtors' sale, use, or lease of the Prepetition Collateral and, subject to entry of the Final DIP Order, the priming of the alleged prepetition liens held by the Prepetition Lenders (as defined below) by the DIP Liens (as defined below);

(ii)      Subject and subordinate to the Carve Out (as defined below), replacement liens to the Prepetition Lenders, to the extent they have valid prepetition liens on the Prepetition Collateral;

(iii)      Authorizing the Debtors, as borrowers, to enter into a senior secured postpetition financing facility (the "DIP Facility") consisting of a superpriority debtor in possession credit facility pursuant to the terms and conditions of that certain Superpriority Secured Debtor in Possession Credit Facility Term Sheet (as amended or modified from time to time, the "DIP Term Sheet") among the Debtors and Create Capital, LLC (the "DIP Lender") attached to this Interim DIP Order as **Exhibit 1**, and which shall consist of a superpriority priming line of credit and term loan facility with an aggregate principal amount of up to $8.0 million from the DIP Lender as follows:

a.      ***Interim Approval.*** From the date of the Interim DIP Order until the date a Final DIP Order is entered (the "Interim Period")*,* approval to

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

draw DIP Loans in the maximum amount of $1.3 million, subject to compliance with the terms, conditions, and covenants described in the DIP Term Sheet, the Interim DIP Order, and the Approved Budget (defined below); and

b.  ***Final Approval***.  Upon entry of the Final DIP Order, approval to draw DIP Loans in an amount up to $6.7 million, subject to compliance with the terms, conditions and covenants described in the DIP Loan Documents (defined below), the Final DIP Order and the Approved Budget;

(iv)  Authorizing the Debtors to execute and enter into the DIP Term Sheet and any other agreements, instruments, pledge agreements, guarantees, security agreements, intellectual property security agreements, control agreements, notes and other documents reasonably required by the DIP Lender (collectively, and together with the Orders, the "<u>DIP Loan Documents</u>" and all obligations and indebtedness of any of the Debtors to the DIP Lender under the DIP Loan Documents (including, without limitation the DIP Loans), collectively, the "<u>DIP Obligations</u>") and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Loan Documents, including, but not limited to, granting or perfecting liens or security interests by any of the Debtors in favor of and for the benefit of the DIP Lender on account of the DIP Facility;

(v)  Authorization and direction for the Debtors to use the proceeds of the DIP Facility as expressly provided in the DIP Loan Documents and in accordance with the Approved Budget;

(vi)  Authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Term Sheet and the DIP Loan Documents as such become earned, due and payable, including, but not limited to, the fees and costs of the DIP Lender's professionals, advisors, and consultants (collectively, the "<u>DIP Lender Reimbursements</u>");

(vii)  Granting to the DIP Lender allowed superpriority claims, subject to the Carve Out (as defined below), pursuant to section 364(c)(1) of the Bankruptcy Code payable from and having recourse to all assets of the Debtors;

(viii)  Granting to the DIP Lender (a) liens on all unencumbered prepetition and postpetition property of the Debtors and their respective estates and the proceeds thereof pursuant to section 364(c)(2) of the Bankruptcy Code including—subject to and effective upon entry of the Final DIP Order, and as a "last look" in the event the DIP Lender is not otherwise repaid in full— any Avoidance Proceeds (as defined below), (b) for purposes of the Interim DIP Order only, a junior lien pursuant to 364(c)(3) of the Bankruptcy Code

4861-1202-7294

on the assets of Insight Software, LLC, Keymed, LLC, MD Office, LLC and MRX Holdings, LLC (the "Allegedly Encumbered Debtors"), (c), subject to entry of the Final DIP Order, priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition property of the Debtors' estates and all proceeds thereof, in each case of (a), (b) and (c) above, subject to the Carve Out and with the relative priorities set forth in the Interim DIP Order, and (d) the right to lower the DIP Commitment in its sole discretion if the senior priming liens described in (iii) above are not granted pursuant to the terms of the Final DIP Order;

(ix)   Subject to entry of the Final DIP Order approving such relief, waiving (a) any equitable doctrine of marshaling and (b) the Debtors' right to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code;

(x)    Authorizing the DIP Lender to terminate (a) all commitments to extend credit under the DIP Facility, and (b) to terminate the Debtors' sale, use, or lease of Cash Collateral or the proceeds of the DIP Facility, each upon the occurrence and continuance of an Event of Default (as defined below);

(xi)   Modifying the automatic stay of Bankruptcy Code section 362 (the "Automatic Stay") to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents, including the Interim DIP Order;

(xii)  Approving a waiver of any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness of this Interim DIP Order;

(xiii) Scheduling an interim hearing (the "Interim Hearing") on the Motion;

(xiv)  Scheduling a final hearing (the "Final Hearing") such that the Final Order is entered no later than 35 days after the Petition Date to consider final approval of the DIP Facility; and

(xv)   Granting such other and further relief as is just and proper.

and this Court having considered the Motion, the exhibits attached thereto, the DIP Loan Documents, and the *Declaration of Sophia Turrell, Chief Executive Officer, in Support of First Day Motions* (the "First Day Declaration") and the *Declaration of Mark Shapiro* in support of the Motion (the "Shapiro Declaration," together with the First Day Declaration, the "Declarations"), the evidence submitted, and the record made at the Interim Hearing held before this Court on January __, 2024; and due, proper and sufficient notice of the Motion, having been given in accordance with Bankruptcy Rules 4001(b), (c), and (d) and 9014, and the local rules, procedures

4

and orders of the Court; and the Interim Hearing to consider the relief requested in the Motion having been held and concluded; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by this Court; and it appearing to this Court that granting the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates (as defined under Bankruptcy Code section 541, the "Estates"), and otherwise is fair and reasonable and in the best interests of the Debtors, their Estates, and their creditors and other constituents, and is essential for the continued operation of the Debtors' business; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    *Petition Date*.  On January 16, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court commencing these chapter 11 cases (these "Chapter 11 Cases").  On January 22, 2024, this Court entered an order approving the joint administration of these Chapter 11 Cases.  The Debtors are continuing to operate their business and manage their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or official committee of unsecured creditors ("Committee") has been appointed in these Chapter 11 Cases.

B.    *Jurisdiction and Venue*.  This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these Chapter 11 Cases, the Motion, the parties, and the Debtors' property. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue for these Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief sought herein are Bankruptcy Code sections 105, 361, 362, 363,

364, 503, and 507, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and the Complex Case Procedures.

   C. *Prepetition Secured Debt.* Between 2014 and 2017, certain of the Debtors entered into multiple allegedly secured term loan agreements (collectively, the "Prepetition Term Loans" and the underlying documents being the "Prepetition Loan Documents") with various entities related to GHTG Investment, LLC (collectively, the "Prepetition Lenders") for the purpose of acquiring certain other Debtor entities. Each Prepetition Term Loan, if truly debt, is due at maturity, bears interest at rates of 5–5.50% per annum and matures in either June 2029 or December 2029. As of the Petition Date, the outstanding aggregate principal and interest due under the Prepetition Term Loans purports to be approximately $118 million. The Debtors have no other long-term debt obligations.

   i. Certain of the Prepetition Term Loans are purportedly secured by the membership interests and books and records of the borrowing and acquired entities, and all proceeds, supporting obligations, and products of the foregoing. Certain others are purportedly secured by substantially all of the borrowers' assets. The relevant Prepetition Lenders may not be fully perfected. A chart listing each Prepetition Term Loan is attached to the First Day Declaration as Exhibit C.

   ii. The Prepetition Loan Documents generally attempt to grant security interests to the Prepetition Lenders in substantially all of certain Debtors' assets. However, at this juncture, it does not appear as if the Prepetition Lenders have properly perfected their liens in the Debtors' cash because it appears the Prepetition Lenders do not "control" the deposit accounts: (i) there do not appear to be any deposit account control agreements ("DACAs") in place with respect to any of the Debtors and (ii) the Prepetition Lenders do not appear to be banks and there do not

appear to be any deposit accounts residing at any of the Prepetition Lenders in which the Debtors deposit cash.

        iii.      Additionally, it appears there may be other lien and perfection (imperfection) issues because, for certain of the Debtors, no UCC-1 financing statement was filed at all, and in other instances, UCC-1 financing statements extend only to a pledge of the stock/membership interests in certain subsidiaries and not to any assets of the borrower or the subsidiary in question.

        iv.      Attached as <u>Exhibit B</u> to the Motion is a chart showing, among other things, the Debtors' belief as to which Debtors have financing statements filed against them, and the scope of the collateral set forth in the applicable UCC-1 financing statement.

        v.      The Debtors therefore contend that, because the Prepetition Lenders do not have a properly perfected lien on the Debtors' cash, they cannot meet their burden of proof under section 363(p) of the Bankruptcy Code and are not entitled to adequate protection for the Debtors' postpetition use of cash.  The Debtors nonetheless seek to provide the Prepetition Lenders with replacement liens as adequate protection on an interim basis, pending entry of the Final DIP Order and a determination by the Court as to the validity, priority and extent of the Prepetition Lenders' alleged liens.

        vi.      The Debtors further contend that the Prepetition Lenders are all insiders of Global Growth Holdings, Inc. and its affiliates (including the individual behind Global Growth, Greg Lindberg), the private equity firm that was the indirect prior owner of the Debtors before the Debtors were transferred into an irrevocable trust on or about July 22, 2021, called the "ECL Trust."  The ECL Trust, since its formation, has been the sole member of Eye Care Leaders

Holdings Portfolio, LLC ("HoldCo"), the Debtors' ultimate parent, as set forth in HoldCo's Amended and Restated Operating Agreement also dated July 22, 2021.

vii.        As a result of this insider relationship, and the multiple proceedings and allegations against Global Growth, Mr. Lindberg and various affiliates,[3] the Debtors believe that the claims and liens allegedly held by the Prepetition Lenders are subject to recharacterization and/or equitable subordination.

D.    *Findings Regarding DIP Facility and the Use of Cash Collateral.*

i.    Request for Postpetition Financing and Use of Cash.  The Debtors seek authority to enter into and perform under the DIP Loan Documents.  The DIP Lender shall have no obligation to make loans or advances except pursuant to the terms and conditions set forth herein and in the other DIP Loan Documents and no obligation to waive any conditions required thereunder.  The Debtors also seek authority to use case on the terms described herein, and in accordance with the Approved Budget, which shall be subject to Permitted Variances (as defined below) to administer their Chapter 11 Cases and fund their operations.

---

[3] *See, e.g.*, *PB Life & Annuity Co., Ltd. v. Lindberg, et al.*, Adv. No. 23-01000 (LGB) (Bankr. S.D.N.Y.); *United States v. Lindberg, et al.*, Case No. 5:19-cr-22-MOC-DSC (W.D.N.C.); *United States v. Lindberg*, 3:23-cr-48-MOC (W.D.N.C.); *see also Southland Nat'l Ins. Corp. v. Lindberg*, 289 N.C. App. 378, 381, 889 S.E.2d 512, 516 (2023), writ allowed, 894 S.E.2d 747 (N.C. 2023) and review allowed in part, denied in part, 894 S.E.2d 748 (N.C. 2023); *see also* https://www.justice.gov/opa/pr/former-insurance-executive-indicted-2b-fraud-scheme (last visited on Jan. 18, 2024) (" 'The indictment reveals a carefully orchestrated scheme that relied on a web of complex financial investments and transactions designed to evade regulators, disguise the financial health of Lindberg's insurance companies, and conceal the alleged purpose of the scheme: Lindberg's personal gain,' said U.S. Attorney Dena J. King for the Western District of North Carolina. 'My office will continue to work with our law enforcement partners to investigate and prosecute financial wrongdoing and hold perpetrators accountable for their actions' "); https://www.justice.gov/criminal/criminal-vns/case/united-states-v-greg-e-lindberg (last visited on Jan. 18, 2024) ("According to court documents, from no later than 2016 through at least 2019, Lindberg and others allegedly conspired and schemed to defraud various insurance companies, other third parties, and ultimately thousands of insurance policyholders. Lindberg allegedly deceived the North Carolina Department of Insurance and other regulators, evaded regulatory requirements meant to protect policyholders, concealed the true financial condition of his insurance companies, and improperly used insurance company funds for his personal benefit. In particular, the indictment alleges that Lindberg personally benefitted from the fraud in part by using insurance company funds to finance his lavish lifestyle, including the purchase and refinancing of personal real estate and 'forgiving' more than $125 million in loans from his affiliated companies to himself to fund his personal expenses").

4861-1202-7294

ii.      Priming of the Prepetition Liens.  The Debtors do not seek to prime the alleged liens of the Prepetition Lenders as part of this Interim DIP Order.  This matter is reserved for the Final Hearing.

iii.      Need for Postpetition Financing and Use of Cash.  The Debtors do not have sufficient liquidity to operate their business in the ordinary course or to pursue either a sale or a stand-alone restructuring without the financing requested in the Motion.  The Debtors' ability to maintain business relationships with vendors, suppliers, and customers, to pay their employees, pay certain fees and expenses as set forth herein, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize and preserve the value of their respective Estates for the benefit of all stakeholders.  The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed DIP Facility with the DIP Lender and to use cash as set forth in this Interim DIP Order and the DIP Loan Documents is vital to the Debtors' preservation and maintenance of going concern value.  If the Debtors do not obtain authorization to borrow under the DIP Loan Documents, they, and their Estates, will suffer immediate and irreparable harm.  Accordingly, the Debtors have an immediate need to obtain the DIP Loans and to use cash.

iv.      No Credit Available on More Favorable Terms.  As set forth in the Shapiro Declaration and as demonstrated at the Interim Hearing, given their current financial condition, financing arrangements, and capital structure, the Debtors have been unable to procure the necessary financing from sources other than the DIP Lender on terms more favorable than those set forth in the DIP Term Sheet.  The Debtors have been unable to reasonably obtain adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtors have also been unable to obtain secured credit from other sources: (a) having priority

9

over that of administrative expenses of the kind specified in Bankruptcy Code sections 503(b), 507(a), and 507(b); (b) secured only by a lien on property of the Debtors and their Estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their Estates that is subject to a lien.  Financing on a postpetition basis is not otherwise available without granting to the DIP Lender: (x) automatically perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after- acquired assets with the priorities set forth herein; (y) superpriority claims and liens; and (z) the other protections to the extent set forth in this Interim DIP Order.  After considering all reasonable alternatives, the Debtors have concluded, in the exercise of their sound and reasonable business judgment, that the DIP Facility, including, without limitation, the DIP Loans, represents the best financing available to them at this time.

v.      Use of Proceeds of the DIP Facility.  As a condition to entry into the DIP Loan Documents, the extensions of credit under the DIP Facility and the authorization to use cash, the Debtors have agreed, that proceeds of the DIP Facility and cash shall be used in accordance with the terms of this Interim DIP Order, the DIP Loan Documents, and the Approved Budget (which shall be subject to Permitted Variances), solely to (i) provide working capital and for general corporate purposes of the Debtors during the Chapter 11 Cases; (ii) pay interest, fees, costs and expenses related to the DIP Facility; (iii) pay the fees, costs and expenses of the estate professionals retained in the Chapter 11 Cases as set forth in the Approved Budget and approved by the Bankruptcy Court; (iv) pay the DIP Lender Reimbursements; (v) make all permitted payments of costs of administration of the Chapter 11 Cases; and (vi) pay such prepetition expenses as are consented to by the DIP Lender and approved by the Bankruptcy Court (collectively, the "Permitted DIP and Cash Uses").

4861-1202-7294

vi.   <u>The DIP Facility Terms and Conditions are Fair and Reasonable</u>.  Based on the Motion, the Shapiro Declaration, and the record presented to the Court at the Interim Hearing, the terms and conditions of the DIP Facility pursuant to the DIP Loan Documents (including the payment of fees and expenses contemplated thereunder) and the use of the DIP Collateral (defined below) and cash, pursuant to this Interim DIP Order are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are supported by reasonably equivalent value and consideration, and were entered into at arm's-length, under no duress, and without undue influence, negligence, or violation of public policy or law.  Use of cash and any credit to be extended as set forth in the DIP Loan Documents shall be deemed to have been so allowed, advanced, made, used, or extended in good faith, and for valid business purposes and uses, within the meaning of Bankruptcy Code section 364(e), and the DIP Lender is therefore entitled to the protections and benefits of Bankruptcy Code section 364(e) and this Interim Order.

vii.   <u>Bankruptcy Code Sections 506(c) and Marshaling</u>.  Subject to entry of the Final DIP Order, the DIP Lender is entitled to a waiver of (I) the provisions of Bankruptcy Code section 506(c), and (II) the equitable doctrine of "marshaling" or any similar doctrine.

viii.   <u>Adequate Protection</u>.   The Debtors have agreed, despite the alleged deficiencies in the Prepetition Lender's Liens and the contention that the Prepetition Lenders' claims and liens may be subject to subordination and/or recharacterization, pursuant to Bankruptcy Code sections 361, 362, 363, and 364, to provide the Prepetition Lenders with adequate protection against any diminution in value of their interests in the Prepetition Collateral, as set forth herein.

ix.   <u>Good Faith Pursuant to Section 364(e)</u>.  The terms and conditions of the DIP Loan Documents, this Interim DIP Order, and the provision of the DIP Facility were

11

negotiated in good faith and at arm's length among the Debtors and the DIP Lender with the assistance and counsel of their respective advisors. Credit to be extended under the DIP Facility shall be deemed to have been allowed, made, or extended in good faith by the DIP Lender within the meaning of section 364(e) of the Bankruptcy Code.

    x.  <u>Good and Sufficient Cause Shown</u>.  Good and sufficient cause has been shown for entry of this Interim DIP Order.  The ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Loan Documents is vital to the Debtors' Estates and creditors. The relief requested in the Motion is necessary, essential, and appropriate, and is in the best interest of and will benefit the Debtors, their creditors, and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (a) minimize disruption to the business and ongoing operations, (b) preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' stakeholders, and (c) maximize and stabilize the value of the Debtors' assets and avoid immediate and irreparable harm to the Debtors, their creditors, their business, their employees, and their assets.  The terms of the DIP Facility are fair and reasonable, reflect each Debtor's exercise of its business judgment, and are supported by reasonably equivalent value and fair consideration.

    xi.  <u>Final Hearing</u>.  At the Final Hearing, the Debtors will seek final approval of the proposed DIP Facility and use of cash pursuant to the Final DIP Order, which shall be in form and substance acceptable to the DIP Lender.  Notice of the Final Hearing and Final DIP Order will be provided in accordance with this Interim DIP Order and no further notice, except as provided by this Interim DIP Order, shall be required.

    xii.  <u>Notice</u>.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier,

12

or hand delivery, to certain parties in interest, including: (a) the U.S. Trustee for the Northern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agent(s) to the Prepetition Lenders; (d) the United States Attorney's Office for the Northern District of Texas; (e) the Internal Revenue Service; (f) the state attorneys general for states in which the Debtors conduct business; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002. Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein, and the Interim Hearing is appropriate notice thereof and complies with Bankruptcy Rules 4001(b) and (c) and the Complex Case Procedures, and no further notice of the relief granted herein is necessary or required.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.      *Motion Approved*. The Motion is granted on an interim basis in accordance with the terms of this Interim DIP Order. All objections to and reservations of rights with respect to the Motion and to the entry of this Interim DIP Order to the extent not withdrawn or resolved are hereby overruled on the merits in their entirety.

2.      *Authorization of the DIP Loans and the DIP Loan Documents*.

a.      The DIP Facility is hereby approved on an interim basis. The Debtors are hereby authorized to execute, issue, deliver, enter into, and adopt, as the case may be, the DIP Loan Documents. Pending entry of the Final DIP Order, the Debtors are hereby authorized to borrow money pursuant to the DIP Loan Documents and request draws thereunder on an interim basis and in accordance with the terms of this Interim DIP Order, the DIP Loan Documents, and the Approved Budget (which shall be subject to Permitted Variances), in an aggregate principal

amount not to exceed $1.3 million.  Upon entry of the Final DIP Order, the Debtors may draw such amounts as are necessary and agreed to by the DIP Lender subject to the conditions set forth in the Approved Budget and the DIP Orders; *provided however*, that the aggregate amount of all DIP Loans shall not exceed $8.0 million (the "Total DIP Commitment").[4]

      b.      In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized to perform all acts, to make, execute, and deliver all instruments and documents that may be necessary or required for performance by the Debtors under the DIP Loan Documents and the creation and perfection of the DIP Liens described in, provided for, and automatically perfected by this Interim DIP Order and the DIP Loan Documents.  The Debtors are hereby authorized to pay, in accordance with this Interim DIP Order, the principal, interest, fees, expenses, DIP Lender Reimbursements and other amounts described in the DIP Loan Documents as such become due and without need to obtain further Court approval, as set forth herein.

      c.      The Origination Fee and the Closing Fee shall each be earned immediately upon entry of this Interim DIP Order.  The Origination Fee shall be payable upon the Closing Date of the DIP Loan, and shall be deducted from the initial advance approved herein.  The Closing Fee shall be payable upon the earlier of (i) the DIP Termination Date, or (ii) the closing of a sale following entry of a Sale Order (as defined below); *provided, however*, that no Closing Fee shall be payable if the DIP Lender is the successful bidder for the Debtors' assets.  Neither the Origination Fee nor the Closing Fee shall be subject to any offset, defense, claim, counterclaim or diminution of any type, kind or nature whatsoever.

      d.      The DIP Loan Documents, upon execution, shall be valid and binding obligations of the Debtors, enforceable against the Debtors and their Estates in accordance with

---

[4] The DIP Lender has reserved the right to reduce the Total DIP Commitment in the event the requested lien priming pursuant to section 364(d) of the Bankruptcy Code is not authorized as part of the Final DIP Order.

4861-1202-7294

their terms, and subject to the terms of this Interim DIP Order.  The DIP Loan Documents and this Interim Order constitute and evidence the validity and binding effect of the DIP Obligations of the Debtors, which DIP Obligations shall be enforceable, jointly and severally, against the Debtors, their Estates, and any successors thereto, including, without limitation, any trustee or other estate representative appointed in these Chapter 11 Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases (each, a "Successor Case").  No obligation, payment, transfer, or grant of a security or other interest to the DIP Lender under the DIP Loan Documents or this Interim DIP Order shall be stayed, restrained, avoidable, voidable, or recoverable under the Bankruptcy Code or any applicable law (including, without limitation, under Bankruptcy Code section 502(d)), or subject to any defense, reduction, setoff, recoupment, or counterclaim of any kind.

   e. From and after the Petition Date, the Debtors are authorized to use extensions of credit under the DIP Facility for the purposes specifically set forth in this Interim DIP Order and the DIP Loan Documents, and in compliance with the Approved Budget.  The Debtors are authorized, subject to the satisfaction of the conditions set forth in the DIP Loan Documents, to use proceeds of the DIP Collateral and the Prepetition Collateral, subject to the Carve Out, and to draw upon the DIP Facility to (a) pay fees, costs, and expenses incurred in connection with the transactions contemplated by the DIP Loan Documents; (b) pay other administrative costs incurred in connection with the Chapter 11 Cases consistent with the Approved Budget, which shall be subject to Permitted Variances; (c) pay for other working capital and general corporate purposes of the Debtors consistent with the Approved Budget, which shall be subject to Permitted Variance, and other orders entered by the Court; and (d) fund the Professional Fee Reserve.

3.      *Non-Material and Material or Adverse DIP Amendments*.  Subject to the terms and conditions of the DIP Loan Documents, the Debtors and the DIP Lender may supplement and otherwise make amendments or modifications DIP Loan Document that are non- material and non-adverse to the Debtors.  The DIP Lender may waive any provision of the DIP Loan Documents, without further approval of the Court; *provided, however,* that the Debtors shall file a notice on the Court's docket of any such amendment, modification, supplement or waiver, not more than three (3) Business Days after the effective date thereof.  Any amendments, modifications, or supplements to any DIP Loan Documents, other than as set forth in the preceding sentence (collectively, "Material or Adverse DIP Amendments"), that are agreed to by the Debtors and the DIP Lender, as applicable, in accordance with the terms of the DIP Loan Documents, shall be filed on the Docket of these Chapter 11 Cases, with notice to (i) the Office of the United States Trustee and (ii) counsel for the Committee or, in the event no Committee is appointed or existing at the time, the Debtors' consolidated list of thirty (30) largest unsecured creditors.  If no party in interest files an objection to the Material or Adverse DIP Amendment with the Court within three (3) Business Days from the date of such notice, the Debtors and the DIP Lender are authorized and empowered to execute, deliver, and implement, in accordance with the terms of the DIP Loan Documents, such Material or Adverse DIP Amendment, without further notice, hearing, or approval of this Court.  Any Material or Adverse DIP Amendment subject to a timely and unresolved objection must be approved by the Court to be effective.

4.      *Approved Budget*.

a.      Compliance with Approved Budget.  The Debtors and the DIP Lender have agreed to the Approved Budget setting forth all projected cash receipts and cash disbursements on a weekly basis, a copy of which is attached hereto as **Exhibit 2**. The Debtors shall deliver an

updated budget to the DIP Lender at such time and in such manner as set forth herein and in the DIP Loan Documents.

        b.    <u>Permitted Variance and Financial Reporting Requirements</u>.  As set forth further herein, the Debtors shall deliver the reports required by the DIP Loan Documents, including Variance Reports (for operating disbursements only, pursuant to the DIP Loan Documents) and Financial Reporting Requirements, as required by the DIP Loan Documents.

        5.    *Superpriority Claims*.  Subject and subordinate to the Carve Out, pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall be allowed claims against the Debtors, jointly and severally, with priority over any and all administrative expenses (the "<u>DIP Superpriority Claims</u>") and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all administrative expenses or other claims arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113, or 1114, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and their Estates and all proceeds thereof including, subject to the entry of the Final Order, the proceeds of actions under Chapter 5 of the Bankruptcy Code.  Other than the Carve Out, no claims (including, without limitation, any priority claims) are, or will be, senior to, prior to, or *pari passu* with the DIP Superpriority Claims or any of the DIP Obligations or with any of the other claims of the DIP Lender arising hereunder or under the DIP Loan Documents or otherwise in connection with the DIP Facility.

4861-1202-7294

6.     *DIP Liens and DIP Collateral.*  As security for the DIP Obligations, effective and perfected automatically upon entry of this Interim DIP Order, pursuant to Bankruptcy Code sections 364(c)(2) and 364(c)(3),[5] and without the necessity of the execution by the Debtors (or recordation or other filing or notice) of security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control by the DIP Lender of any property, the DIP Lender is hereby granted security interests in and liens and mortgages upon all tangible and intangible prepetition and postpetition property in which any or each of the Debtors or their respective Estates have an interest of any kind or nature, whether existing on or as of the Petition Date or thereafter acquired or created, wherever located, including, without limitation, the proceeds, products, and offspring of any of the foregoing, including, subject to the entry of the Final DIP Order, proceeds of claims and causes of action arising under Bankruptcy Code sections 502(d), 544, 547, 548, 549, 550 and 553 and any other avoidance or similar action under the Bankruptcy Code or applicable nonbankruptcy law (such claims and causes of action being "Avoidance Actions" and all tangible and intangible prepetition and postpetition property in of the Debtors or their estates being, collectively, the "DIP Collateral"), subject and subordinate only to the Carve Out (all such liens and security interests granted to the DIP Lender, pursuant to this Interim Order and the DIP Loan Documents, the "DIP Liens"), will be provided to the DIP Lender as follows:

a.     First Lien on Unencumbered Property.  Pursuant to Bankruptcy Code section 364(c)(2), a valid, binding, continuing, enforceable, fully perfected first priority lien on, and security interest in, all property of the Debtors, wherever located, that is not subject to a valid, perfected, non-avoidable and enforceable lien in existence on or as of the Petition Date or valid

---

[5] As stated previously, the Court will address priming liens under section 364(d), as and if necessary, at the Final Hearing.

4861-1202-7294

liens perfected (but not granted) after the Petition Date to the extent such postpetition perfection is permitted by Bankruptcy Code section 546(b), including, but not limited to:  (i) any and all unencumbered cash, accounts receivable, inventory, general intangibles, contracts, securities, chattel paper, owned real property, fixtures, machinery, equipment, vehicles, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property; and (ii) the proceeds, products and offspring of all of the foregoing.

b.      <u>Liens Junior to Certain Other Liens</u>.  Pursuant to Bankruptcy Code section 364(c)(3), a valid, binding, continuing, enforceable, fully perfected junior security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtors that, on or as of the Petition Date (including pursuant to Bankruptcy Code section 546(b)), is subject to valid, perfected and unavoidable liens.

c.      <u>"Last Look" to Avoidance Action Proceeds</u>.  Subject to entry of the Final DIP Order and the grant of a lien on proceeds of Avoidance Actions ("<u>Avoidance Action Proceeds</u>"), the DIP Lender shall only avail itself of Avoidance Action Proceeds on a "last look" basis, and only if all other DIP Collateral is inadequate to indefeasibly repay the DIP Obligations in full.

7.      *Adequate Protection for the Prepetition Lenders*.  The Prepetition Lenders are hereby granted, pursuant to Bankruptcy Code sections 361, 362, 363(c)(2), and 363(e), replacement liens on the Prepetition Collateral to the same extent, validity and priority as existed prior to the Petition Date ("<u>Adequate Protection Liens</u>"), subject and subordinate only to (i) the DIP Liens and (ii) the Carve Out.

4861-1202-7294

8.    *Carve Out*.

a.    As used herein, the term "Carve Out" shall mean an amount equal to the sum of the following (A) : (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (ii) below); (ii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, final order, or otherwise, all accrued and unpaid fees, disbursements, costs and expenses incurred by persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and all accrued unpaid fees, disbursements, costs and expenses incurred by the Committee (if any) pursuant to sections 328 and 1103 of the Bankruptcy Code (the "Committee Professionals," together with the Debtor Professionals, the "Estate Professionals," and such Estate Professional fees in each case in accordance with the Budget, the "Allowed Professional Fees") at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iii) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $200,000 incurred after the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, final order, or otherwise (the amounts set forth in this clause (iii),  the "Post-Carve Out Trigger Notice Cap"); *provided, however*, nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement or compensation sought by any such professionals or any other person or entity.

b.    For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice (which may be delivered by e-mail (or other electronic means)) by the DIP Lender

20

to the Debtors and their counsel, the United States Trustee, and counsel to the Committee, and filed on the docket of the Chapter 11 Cases, which notice may be delivered following the occurrence of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

        c.      On a weekly basis—to the extent there is sufficient cash on hand prior to entry of the Final DIP Order, and then following entry of the Final DIP Order—the fees of the Debtors' and Committee's professionals provided for in the Approved Budget shall be funded into one of the Debtors' accounts at East West Bank to be used solely to satisfy Allowed Professional Fees in accordance with any applicable orders entered in the Chapter 11 Cases (the "Professional Fee Reserve").  The funds on deposit in the Professional Fee Reserve shall be available to satisfy the obligations owed to Estate Professionals, and the DIP Lender shall have a security interest on any residual amounts remaining in the Professional Fee Reserve after satisfaction in full of all Allowed Professional Fees.

        d.      For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve Out shall be senior to all liens and claims securing the DIP Facility, and all other forms of adequate protection, liens, or claims securing the DIP Obligations.

        e.      Notwithstanding the foregoing, the Carve Out shall not include, apply to, or be available for any fees or expenses incurred by any party in connection with (i) the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation (A) against the DIP Lender or (B) challenging the amount, validity, perfection, priority, or enforceability of or asserting any defense, counterclaim, or offset to, the obligations and the liens and security interests granted under the DIP Loan Documents including, in each case, without limitation, for lender liability or pursuant to any section of the Bankruptcy Code, applicable non-bankruptcy law or

21

otherwise; (ii) attempts to modify any of the rights granted to the DIP Lender; (iii) attempts to prevent, hinder, or otherwise delay any of the DIP Lender's assertion, enforcement, or realization upon any DIP Collateral in accordance with the DIP Loan Documents, this Interim DIP Order, and the Final DIP Order; (iv) paying any amount on account of any claims arising before the commencement of the Chapter 11 Cases unless such payments are provided for in the Approved Budget and approved by an order of this Court; (v) the prosecution or support any plan of liquidation or reorganization to which the DIP Lender has not consented; or (vi) any direct or indirect objection or opposition to, or any other effort to impede or compromise in any way, any credit bid made by the DIP Lender to the extent such bid is not consistent with this Interim DIP Order.

9.      *Limitations on Charging Expenses Against Collateral; No Marshaling*.  Effective upon entry of the Final DIP Order, (i) other than as set forth herein with relation to Avoidance Action Proceeds, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral and all proceeds shall be received and applied pursuant to the Final DIP Order and the DIP Loan Documents notwithstanding any other agreement or provision to the contrary and (ii) the Debtors (on behalf of themselves and their estates) shall waive, and shall not assert in the Chapter 11 Cases or any successor cases, any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender, upon the DIP Collateral.

10.     *Use of Prepetition Collateral and Cash*.  Subject to the terms and conditions of the DIP Loan Documents and this Interim DIP Order, and in accordance with the Approved Budget, which shall be subject to Permitted Variances, the Debtors are hereby authorized to use the DIP

Collateral and Prepetition Collateral, including cash, until the DIP Termination Date (as defined

below) for working capital and general corporate purposes, including interest, fees, costs, and

expenses related to these Chapter 11 Cases, the DIP Loan, and the DIP Loan Documents, including

payment of any adequate protection obligations as set forth herein; *provided*, that nothing in this

Interim DIP Order shall authorize, other than in the ordinary course of the Debtors' business, the

sale, transfer, lease, encumbrance, or other disposition of any assets of the Debtors or their Estates

without the prior written consent of the DIP Lender (and no such consent or direction shall be

implied from any other action, inaction, or acquiescence by any DIP Lender or any order of this

Court), except as permitted in the DIP Loan Documents and this Interim DIP Order and approved

by the Court to the extent required under applicable bankruptcy law.

11.    *Perfection of DIP Liens and Adequate Protection Liens*.  This Interim DIP Order

shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens

granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity

of filing or recording financing statements, intellectual property filings, mortgages, notices of lien

or similar instruments in any jurisdiction, taking possession of or control over, or the taking of any

other action (including, for the avoidance of doubt, entering into any deposit account control

agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP

Liens and the Adequate Protection Liens, or to entitle the DIP Lender or the Prepetition Lender to

the priorities granted herein.  Notwithstanding the foregoing, the DIP Lender and the Prepetition

Lender each are hereby authorized, but not required, to file or record financing statements,

intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction,

taking possession of or control over, or take any other action, as they may elect, in order to validate

and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP

4861-1202-7294

Lender or Prepetition Lender chooses to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute, or subordination immediately upon entry of this Interim DIP Order.  A certified copy of this Interim Order may, in the discretion of the DIP Lender or the Prepetition Lender, as the case may be, be filed with any filing or recording office or with any registry of deeds or similar office, and accordingly, each officer is authorized to accept such certified copy of this Interim Order for filing and recording.

12. *Evidence of Liens*.  The Debtors shall execute and deliver promptly to the DIP Lender all such financing statements, mortgages, control agreements, notices, and other documents as the DIP Lender may reasonably request to evidence, confirm, validate, or perfect the DIP Liens.

13. *Enforceability of DIP Obligations*.  Subject to entry of the Final DIP Order, if any or all of the provisions of this Interim DIP Order are hereafter reversed, modified, vacated, or stayed, such reversal, stay, modification, or vacatur shall not affect (a) the validity, priority, or enforceability of any DIP Liens or DIP Obligations incurred prior to the effective date of such reversal, stay, modification, or vacatur or (b) the validity, priority, or enforceability of the DIP Liens.  Notwithstanding any such reversal, stay, modification, or vacatur, any use of cash and any DIP Obligations incurred by the Debtors to the DIP Lender prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the original provisions of this Interim DIP Order, and the DIP Lender shall be entitled to all of the rights, remedies, privileges, and benefits granted in Bankruptcy Code section 364(e), this Interim DIP Order, and the DIP Loan Documents.

4861-1202-7294

14.     *Survival of Rights Granted Herein.*  Except as expressly provided in this Interim DIP Order or in the DIP Loan Documents, the Carve Out, the DIP Liens, the DIP Superpriority Claims, and all other rights and remedies of the DIP Lender granted by this Interim DIP Order and the DIP Loan Documents shall survive, and shall not be modified, impaired, or discharged by (a) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases, or (b) the entry of a confirmation order and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors' waiver of discharge as to any remaining DIP Obligations.  The terms and provisions of this Interim DIP Order and the DIP Loan Documents shall continue in these Chapter 11 Cases and in any Successor Cases, and the DIP Liens, the DIP Obligations, the Carve Out, the DIP Superpriority Claims and the other administrative claims granted pursuant to this Interim DIP Order, and all other rights and remedies of the DIP Lender granted by this Interim DIP Order and the DIP Loan Documents shall continue in full force and effect until all DIP Obligations are indefeasibly paid in full in cash or receive other treatment as agreed to by the DIP Lender in its sole discretion.

15.     *After-Acquired Property*.  Except as otherwise provided in this Interim DIP Order, pursuant to Bankruptcy Code section 552(a), all property acquired by the Debtors on or after the Petition Date is not, and shall not be, subject to any lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, including, without limitation, in respect of the Prepetition Loan Documents (other than with respect to the Adequate Protection Liens), except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, binding, enforceable, perfected, and unavoidable lien as of the Petition Date which is not subject to recharacterization or subordination under the Bankruptcy Code, other provisions or principles of applicable law.

4861-1202-7294

16.    *Protection of the Rights of the DIP Lender.*  Unless the DIP Lender has provided its prior written consent, or all DIP Obligations have been indefeasibly paid in full in cash, there shall not be entered in any of these Chapter 11 Cases or any Successor Cases any order (including any confirmation order) that authorizes any of the following:  (a) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Obligations, and the DIP Superpriority Claims, except as expressly set forth in this Interim DIP Order; (b) the use of cash for any purpose other than as permitted in the Approved Budget, DIP Loan Documents, and this Interim DIP Order; (c) the return of goods pursuant to Bankruptcy Code section 546(h) (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor or any creditor's taking any setoff against any of its prepetition indebtedness based upon any such return of goods pursuant to Bankruptcy Code section 553 or otherwise; or (d) any modification of any of the DIP Lender's rights under this Interim DIP Order, the DIP Loan Documents with respect to any DIP Obligations.

17.    *Proceeds of Subsequent Financing.*  If the Debtors, any trustee, any examiner with enlarged powers, any responsible officer, or any other estate representative subsequently appointed in the Chapter 11 Cases or any Successor Case, shall obtain credit or incur debt other than the credit or debt provided pursuant to the DIP Loan Documents at any time prior to the repayment in full of all DIP Obligations, including subsequent to the entry of a confirmation order with respect to the Debtors and the Debtors' Estates, then all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender until indefeasible payment in full of the DIP Obligations in existence at such time in accordance with the DIP Loan Documents.

18.    *Maturity Date.*   All DIP Obligations will be due and payable in full in cash unless otherwise agreed to by the DIP Lender in writing on the earliest of the following (the "Maturity Date"): (i) July 31, 2024, (ii) if the Final DIP Order has not been entered, thirty-five days after the Petition Date, (iii) the acceleration of the DIP Loan and the termination of the DIP Commitments upon the occurrence of an Event of Default (defined below), (iv) the effective date of any plan of reorganization, (v) the date the Court converts any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (vi) the date the Court dismisses any of the Chapter 11 Cases, (vii) the consummation of the sale of all or substantially all of the Debtors' assets and (viii) the date an order is entered in any of the Chapter 11 Cases appointing a chapter 11 trustee or examiner with enlarged powers (any such date, the "DIP Termination Date").   Principal of, and accrued interest on, the DIP Loan and all other amounts owing to the DIP Lender under the DIP Facility shall be payable on the DIP Termination Date.

19.    *Case Milestones.*   The Debtors and the DIP Lender have agreed on the following milestones for these Chapter 11 Cases (the "Milestones" and each, a "Milestone"):

- No later than seven (7) days after filing the Motion, the Court shall have entered the Interim DIP Order.

- No later than fourteen (14) days after the Petition Date, the Debtors shall file with the Court a motion (the "Bid Procedures Motion") to approve procedures for the marketing and sale of the Debtors' assets (the "Bid Procedures Motion") in form and substance reasonably acceptable to the DIP Lender.

- No later than twenty-one (21) days after the Bid Procedures Motion is filed, the Bankruptcy Court shall have entered an order approving the same (the "Bid Procedures Order").   The Bid Procedures Order and applicable bid procedures shall, consistent with the DIP Term Sheet, authorize and approve the DIP Lender's credit bid of the DIP Obligations, in whole or in part, pursuant to section 363(k) of the Bankruptcy Code, for any or all of the Debtors' assets;

- Not later than 30 days after entry of the Bid Procedures Order, the Court shall have entered an order approving one or more sales of the Debtors' assets ("Sale Order"); and

4861-1202-7294

• No later than thirty-five days after the Petition Date, the Court shall have entered the Final DIP Order.

20. *Events of Default.* Subject to any applicable cure or any notice period set forth below, if any, the Debtors' right to use proceeds of the DIP Facility shall terminate without prior order of this Court or any further action by the DIP Lender, unless waived by the DIP Lender in writing and in accordance with the terms of the DIP Loan Documents, on the earliest to occur of (each, an "Event of Default", and the date of any such Event of Default, the "DIP Termination Date"):

• failure to make payments when due under the DIP Loan Documents;

• invalidity of the DIP Loan Documents;

• any of the Debtors shall file a pleading seeking to vacate or modify the Interim DIP Order or the Final DIP Order over the objection of the DIP Lender;

• entry of an order without the prior written consent of the DIP Lender amending, supplementing or otherwise modifying the Interim DIP Order or the Final DIP Order;

• reversal, vacatur or stay of the effectiveness of the Interim DIP Order or the Final DIP Order except to the extent reversed within five (5) Business Days;

• any violation of any material term of the Interim DIP Order or the Final DIP Order by the Debtors;

• dismissal of the Chapter 11 Case of a Debtor with material assets or conversion of the Chapter 11 Case of a Debtor with material assets to a case under Chapter 7 of the Bankruptcy Code, or any Debtor shall file a motion or other pleading seeking such dismissal or conversion of any of the Chapter 11 Cases;

• appointment of a chapter 11 trustee or examiner with enlarged powers, or any Debtor shall file a motion or other pleading seeking such appointment;

• any sale of all or substantially all assets of the Debtors pursuant to section 363 of the Bankruptcy Code, unless such sale is conducted in accordance with the Bid Procedures Order;

• failure to meet a Milestone, unless extended or waived by the prior written consent of the DIP Lender;

28

- the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order by the Court, granting any superpriority claim or lien (except as contemplated herein) which is senior to or *pari passu* with the DIP Claims;

- an order shall be entered in any of the Chapter 11 Cases, without the prior written consent of the DIP Lender: (i) permitting any administrative expense or any claim (now existing or hereafter arising of any kind or nature whatsoever) to have priority equal or superior to the DIP Claims (other than the Carve Out) or (ii) granting or permitting the grant of a lien that is equal in priority or senior to the DIP Liens (other than the Carve Out);

- two or more members of the Debtors' Executive Management Team resign or otherwise terminate their employment relationship with the Debtor. The term "Executive Management Team" shall be defined in the DIP Facility Documents as including the C-Suite executives and such other key employees as the Debtor may expressly identify;

- the Debtors' filing of a motion seeking entry of an order approving any key employee incentive plan, employee retention plan, or comparable plan, without the prior written consent of the DIP Lender;

- cessation of the DIP Liens or the DIP Claims to be valid, perfected and enforceable in all respects;

- Permitted Variances under the Budget are exceeded for any period of time without consent of or waiver by the DIP Lender;

- subject to entry of the Final DIP Order, the allowance of any claim or claims under section 506(c) of the Bankruptcy Code or otherwise against any DIP Lender;

- an order shall have been entered by the Court prohibiting, limiting or restricting the right of the DIP Lender to credit bid for any or all of the Debtors' assets; and

- the payment of any prepetition claim other than (i) as consented to by the DIP Lender, (ii) as authorized by the Approved Budget, (iii) permitted under the terms of the DIP Credit Agreement or (iv) as authorized by an order entered by the Court, including the Interim DIP Order or the Final DIP Order and reflected in the Approved Budget.

21.     *Rights and Remedies Upon Event of Default.* Upon the occurrence and during the

continuance of an Event of Default, the DIP Lender shall, by written notice to the Debtors, its

counsel, the U.S. Trustee and counsel for the Committee, terminate the DIP Facility, declare the

obligations in respect thereof to be immediately due and payable and, subject to the immediately

following paragraph, exercise all rights and remedies under the DIP Loan Documents, the Interim

DIP Order, and the Final DIP Order.  Without further order from the Bankruptcy Court, and subject

to the terms of the Interim DIP Order and the Final DIP Order (including in respect of any required

notices), the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and

modified to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and

during the continuance of any Event of Default under their respective DIP Loan Documents, all

rights and remedies provided for in the DIP Loan Documents, and to take any or all of the

following actions without further order of or application to the Bankruptcy Court (as applicable):

(a) immediately terminate the Debtors' limited use of any cash collateral; (b) cease making any

DIP Loan under the DIP Facility to the Debtors; (c) declare all DIP Obligations to be immediately

due and payable; (d) freeze monies or balances in the Debtors' accounts (and, with respect to the

DIP Credit Agreement and the DIP Facility, sweep all funds contained in the Controlled

Accounts); (e) immediately set-off any and all amounts in accounts maintained by the Debtors

with the DIP Lender against the DIP Obligations, or otherwise enforce any and all rights against

the DIP Collateral in the possession of any of the applicable DIP Lender, including, without

limitation, disposition of the DIP Collateral solely for application towards the DIP Obligations;

and (f) take any other actions or exercise any other rights or remedies permitted under the Interim

DIP Order and the Final DIP Order, the DIP Loan Documents or applicable law to effect the

repayment of the DIP Obligations; *provided, however,* that the DIP Lender must provide the

Debtors, the U.S. Trustee and the Committee with five (5) calendar days' written notice (which

may be by email) and file such notice of the Docket of the Chapter 11 Cases before exercising any

enforcement rights or remedies; *provided, further,* that neither the Debtors, the Committee nor any

30

Case 24-80001-mvl11   Doc 41   Filed 01/23/24   Entered 01/24/24 11:20:12   Desc Main Document   Page 65 of 92

other party-in-interest shall have the right to contest the enforcement of the remedies set forth in the Interim DIP Order and the Final DIP Order and the DIP Loan Documents, other than to argue that an Event of Default and/or a DIP Termination Date has not occurred.  Further, the Debtors are deemed to waive any right, without the prior written consent of the DIP Lender, to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Lender set forth in the Interim DIP Order and the Final DIP Order and in the DIP Loan Documents.

22.    *Financial Reporting.*

a.    Permitted Variance.  The term "Permitted Variances" will mean, for the first full week period after the Closing Date, to be tested on the third business day of each week following the end of such week period (the "Initial Testing Period") and for the Applicable Rolling Period (as defined below) after the Initial Testing Period (each such period after the Initial Testing Period, together with the Initial Testing Period, the "Testing Periods"): (i) all favorable variances, and (ii) an unfavorable variance of no more than 10% for actual operating disbursements (on an aggregate basis), in each case as compared to the budgeted disbursements, respectively, set forth in the Budget with respect to the applicable Testing Period; notwithstanding the foregoing, Professional Fees shall be excluded from the determination of Permitted Variances.  The Permitted Variances with respect to each Testing Period shall be determined and reported to the DIP Lender not later than 5:00 p.m. Central Time on the third business day of each week immediately following the end of each such Testing Period.  Additional variances, if any, from the Budget, and any proposed changes to the Budget, shall be subject to the approval of the DIP Lender.  Variances will be reported on a cumulative basis matching the relevant Applicable Rolling Period in a format replicating the Budget and will include explanation of variances (including whether they are

permanent or temporal in nature).  Variances will be carried over across Applicable Rolling Periods solely to the extent they are permanent in nature.  "<u>Applicable Rolling Period</u>" means, (i) for the Initial Testing Period, the most recently completed calendar week, (ii) for the second Testing Period after the Closing Date, the most recently completed two calendar weeks, (iii) for the third Testing Period after the Closing Date, the most recently completed three calendar weeks and (iv) for each Testing Period thereafter, the most recently completed four calendar weeks.

b.      <u>Other Reporting</u>.  The Debtors shall provide to the DIP Lender (hereinafter the "<u>Financial Reporting Requirements</u>"): (i) following delivery of the Approved Budget on the Closing Date, by not later than 5:00 p.m. Eastern Time on the third business day of the second full week following the Closing Date and by not later than 5:00 p.m. Eastern Time on the third business day of every other week thereafter following the end of each Testing Period, an updated Budget, in each case, in form and substance reasonably satisfactory to the DIP Lender for the subsequent 13 week period consistent with the form of the Budget, and such updated Budget shall become the "Budget" for the purposes of the DIP Facility upon the DIP Lender's acknowledgement that the proposed updated Budget is substantially in the form of the Budget and in substance satisfactory to the DIP Lender (provided, that, until a new Budget has been approved by the DIP Lender, the most recently approved Budget shall govern); and (ii) beginning on the third business day of the first full week following the Closing Date (by not later than 5:00 p.m. Eastern Time), and on the third business day of each week thereafter following the end of each Testing Period (by not later than 5:00 p.m. Eastern Time), a variance report (the "<u>Variance Report</u>") setting forth actual cash receipts and disbursements and cash flows of the Debtors for the prior Testing Period and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such period as compared to the applicable Budget delivered by the Debtors, in each case, on a weekly and

32

cumulative rolling 4-week basis (and each such Variance Report shall include explanations for all material variances and shall be certified by the Chief Financial Officer of the Debtors).   The Debtors will promptly provide notice to the DIP Lender of any Material Adverse Change.

        c.        <u>Meetings with DIP Lender</u>.   At the election of the DIP Lender, on each Monday (or, in the event that such day is not a business day then on the business day immediately following or on a day mutually agreed upon by the DIP Lender and the Borrower's senior management and professionals) during the Chapter 11 Cases, the Debtors' senior management and professionals shall host a telephonic meeting for the DIP Lender and their professionals at which the Debtors' senior management and professionals shall provide an update to the DIP Lender (and make themselves available for questions) with respect to the financial and operating performance of the Debtors and their Estates, including, but not limited to, the Variance Report.

        23.    *Interim DIP Order Controls*.   This Interim DIP Order shall constitute this Court's findings of fact and conclusions of law based upon the record of these Chapter 11 Cases at the Interim Hearing and shall, upon its entry by this Court, take effect and be fully enforceable as of the Petition Date.   In the event of any inconsistency between the terms and conditions of the DIP Loan Documents or this Interim DIP Order, the provisions of this Interim DIP Order shall govern and control.

        24.    *Binding Effect of Interim DIP Order*.   Immediately upon entry by the Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim DIP Order, including the liens granted herein shall, effective as of the Petition Date, become valid and binding upon and inure to the benefit of the Debtors, the DIP Lender, the Committee, the U.S. Trustee, and all other parties in interest and their respective successors and

assigns, including any trustee or other fiduciary hereafter appointed in these Chapter 11 Cases, any

Successor Case, or upon dismissal of the Chapter 11 Cases or any Successor Case.

25.    *Costs, Fees, and Expenses of the DIP Lender.*

a.    <u>DIP Lender Reimbursements</u>.  Subject to the provisions set forth herein, the

Debtors are authorized to pay, when due and payable, the DIP Lender Reimbursements, including,

without limitation, (i) (x) all reasonable and documented (in summary form) out-of-pocket fees,

costs, disbursements and expenses of the DIP Lender (including, but limited in the case of counsel,

to all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and

expenses of the DIP Lender's counsels, and any successor counsel to each), in each case in

connection with the negotiations, preparation, execution and delivery of the DIP Loan Documents

and the funding of all DIP Loan under the DIP Facility, including, without limitation, all due

diligence, transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation

and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained

by the DIP Lender and its counsel and professional advisors in connection with the DIP Facility,

the DIP Loan Documents or the transactions contemplated thereby, the administration of the DIP

Facility and any amendment or waiver of any provision of the DIP Loan Documents, and (ii)

without duplication, all reasonable and documented (in summary form) out-of-pocket fees, costs,

disbursements and expenses of the DIP Lender (including, but limited in the case of counsels, to

all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and

expenses of outside counsels to the DIP Lender (and any successor counsel), and, to the extent

necessary, one firm of local counsel engaged by the DIP Lender in each relevant jurisdiction, and

any successor counsel to such primary counsel and local counsel, in each case in connection with

(A) the enforcement of any rights and remedies under the DIP Loan Documents, (B) the Chapter

11 Cases, including attendance at all hearings in respect of the Chapter 11 Cases; and (C) defending and prosecuting any actions or proceedings arising out of or relating to the DIP Obligations, the Liens securing the DIP Obligations, or any transaction related to or arising in connection with the DIP Credit Agreement or the other DIP Loan Documents.

        b.    <u>Process and Procedure</u>.  Payment of the DIP Lender Reimbursements shall not be subject to allowance by the Court but shall be subject to the following process. At the same time such remittance advices are delivered to the Debtors, the professionals for the DIP Lender shall deliver a copy of their respective remittance advices to counsel for the Committee and the U.S. Trustee. The remittance advices for such fees and expenses shall not be required to comply with any U.S. Trustee guidelines related to the payment of fees and expenses of retained estate professionals, may be in summary form only, and shall not be subject to application or allowance by the Court. Any objections raised by the Debtors with respect to such remittance advices within five (5) calendar days of receipt thereof will be resolved by the Court (absent prior consensual resolution thereof).  Pending such resolution, the undisputed portion of any such remittance advices shall be promptly paid by the Debtors.  Except as otherwise ordered by the Court in the event an objection is timely filed, such fees and expenses shall not be subject to any setoff, defense, claim, counterclaim, or diminution of any type, kind, or nature whatsoever.

       26.    *Right to Credit Bid*.  Subject to Bankruptcy Code section 363(k) and the terms of the DIP Loan Documents and the Carve Out, the DIP Lender shall have the right to credit bid all or any portion of the DIP Obligations as part of any asset sale process, whether conducted pursuant to Bankruptcy Code sections 363 or 1129, or otherwise.

       27.    *Indemnification of DIP Lender*.  The DIP Lender shall have no liability to any third party and shall not be deemed to be in control of the operations of Debtors, or to be acting as a

"responsible person" or managing agent with respect to the operation or management of the Debtors.  The Debtors shall indemnify and hold harmless the DIP Lender and their respective affiliates and officers, directors, employees, agents, and advisors to the extent set forth in the DIP Term Sheet; *provided that* any claim for indemnity under this paragraph must be brought before this Court for approval.

28.     *Good Faith Under Section 364(e).*  The DIP Lender has acted in good faith in connection with the DIP Loan Documents, including this Interim DIP Order, and is entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code.

29.     *Interim Compensation Procedures.*  The DIP Lender hereby consents to entry of an order, to be entered contemporaneously with, or after the entry of, this Interim DIP Order, in a form reasonably acceptable to the DIP Lender.

30.     *Rights Preserved.*  Other than as expressly set forth in this Interim DIP Order, any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Lender and the Prepetition Lenders are preserved.

31.     *No Waiver by Failure to Seek Relief.*  The failure or delay of the DIP Lender to seek relief or otherwise exercise its respective rights and remedies under this Interim DIP Order, the DIP Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Lender.

32.     *No Third Party Rights.*  Except as explicitly provided for herein, this Interim DIP Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

33.     *Immediate Enforceability.*  This Interim DIP Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully

36

enforceable as of the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim DIP Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim DIP Order. Good cause has been shown for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).

34. *Retention of Jurisdiction*. The Court retains jurisdiction to enforce this Interim DIP Order according to its terms to the fullest extent permitted by applicable law.

35. *Final Hearing*. The Final Hearing to consider entry of the Final DIP Order is scheduled for **February 15, 2024 at 9:30 a.m. (CT)** before the Honorable Michelle V. Larson, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, Earle Cabell Federal Building, 1100 Commerce St., Courtroom #2, Dallas, TX 75242-1496.

36. *Notice of Final Hearing*. Within three (3) Business Days of the date of the entry of this Interim DIP Order, the Debtors shall serve a copy of the Motion and this Interim DIP Order upon: (a) the U.S. Trustee; (b) the Internal Revenue Service; (c) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (d) counsel to the DIP Lender; (e) counsel to the Prepetition Lenders; (f) financial institutions where the Debtors hold bank accounts; and (g) any party that has filed prior to such date a request for notices under Bankruptcy Rule 2002 with the Court.

37. *Objection Deadline*. Objections, if any, to the relief sought in the Motion and entry of the Final DIP Order shall be in writing, shall set forth with particularity the grounds for such objections or other statement of position, shall be filed with the Clerk of the Court, and personally

4861-1202-7294

served upon:  (a) proposed counsel to the Debtors; (b) the U.S. Trustee; (c) proposed counsel to

any Committee; and (d) counsel to the DIP Lender so that such objections are filed with the Court

and received by said parties **on or before 4:00 p.m. (CT) on February __, 2024**.

# # # END OF ORDER # # #

<u>Submitted by</u>:

Jason S. Brookner (TX Bar No. 24033684)
Amber M. Carson (TX Bar No. 24075610)
Emily F. Shanks (TX Bar No. 24110350)
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:      (214) 954-4135
Facsimile:      (214) 953-1332
Email:          jbrookner@grayreed.com
                acarson@grayreed.com
                eshanks@ grayreed.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

38

4861-1202-7294

**<u>Exhibit 1</u>**

**DIP Term Sheet**

**EYE CARE LEADERS HOLDINGS, LLC.**

**SUPERPRIORITY SECURED
DEBTOR-IN-POSSESSION CREDIT FACILITY TERM SHEET**

**Summary of Proposed Terms and Conditions**

This Summary of Terms and Conditions (this "DIP Term Sheet") outlines certain terms of the DIP Facility (as defined herein) to be provided by the DIP Lender (as defined herein) subject to the conditions herein and as set forth more fully below and subject to such definitive documentation as the parties may agree to (collectively, and as defined further herein, the "DIP Facility Documents"). The Loan Parties are not authorized to disclose the terms contained herein to any person other than their professional advisors, who shall agree to maintain its confidentiality; *provided, however*, that the Loan Parties may, following agreement on definitive terms, disclose such terms in any pleading required to be filed in the Bankruptcy Court.

| | |
|---|---|
| **Borrower:** | Eye Care Leaders Portfolio Holdings, LLC, a North Carolina limited liability company ("ECL Holdings"), and its affiliated chapter 11 debtors (collectively, the "ECL Debtors," each a "Borrower" and together the "Borrowers" or "you"), each in their capacity as a debtor and debtor in possession (each individually a "Loan Party" and a "Debtor", and collectively, the "Loan Parties" and the "Debtors"), in Jointly Administered Case No. 24-80001, captioned *In re Eye Care Leaders Portfolio Holdings, LLC, et al.* (collectively the "Chapter 11 Cases"), pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").[1] |
| **DIP Lender:** | Create Capital, LLC, a Delaware limited liability company will, either directly or through one or more U.S. affiliates (collectively, the "DIP Lender"), provide the funds for the DIP Facility (as defined below) and provide the DIP Commitments (as defined herein). |
| **Type and Amount of the DIP Facility:** | Subject to the terms and conditions herein, the DIP Lender shall provide a secured superpriority priming debtor in possession non-amortizing facility (the "DIP Facility") comprised of a term loan in the principal amount of $8.0 million, of which (i) $1.3 million (the "Interim Funding") will be available upon entry of an interim order by the Bankruptcy Court, in a form acceptable to the DIP Lender in all respects, approving the terms and conditions of the DIP Facility (the "Interim DIP |

---

[1] The Debtors in the Chapter 11 Cases and the last four digits of each Debtors' federal tax identification number are as follows: ECL PH Services Group LLC (6746); Eye Care Leaders Portfolio Holdings, LLC (0576); Alta Billing Holdings, LLC (4944); Alta Billing, LLC (4823); Canta Health, LLC (7791); DJRTC, LLC (N/A); ECL Group, LLC (9195); ECL Holdings, LLC (8888); Eye Care Leaders Holdings, LLC (1701); iMedicWare, Inc. (6251); IMW EMR, LLC (6421); IMW Holdings, LLC (3980); Insight Software, LLC (8321); Integrity EMR Holdings, LLC (3877); Integrity EMR, LLC (3716); IO Practiceware, Inc. (4507); IOPW Holdings, LLC (0461); IOPW, LLC (N/A); Keymed Holdings, LLC (0301); Keymed, LLC (9379); MD Office, LLC (9075); MDO Group Holdings, LLC (0435); MDX, LLC (5074); Medflow Holdings, LLC (7716); Medflow, Inc. (N/A); MNI Holdings, LLC (7633); MRX Holdings, LLC (N/A); My Vision Express, Inc. (N/A); Penn Medical Informatics Systems, LLC (4584); PI Software Holdings, LLC (N/A); PI Software, LLC (N/A); PMX, LLC (N/A); Revenue Health Solutions, LLC (7025); RHS Holdings, LLC (N/A); The Hoehne Group – Software Division, Inc. (7788). The Debtors' principal offices are located at 555 S. Mangum Street, Suite 100, Durham, NC 27701

Order") and (ii) the remaining $6.7 million will be available upon entry of a final order by the Bankruptcy Court, in a form acceptable to the DIP Lender in all respects, approving the DIP Facility on a final basis (the "Final DIP Order" and together with the Interim DIP Order the "DIP Orders").  The DIP Lender's commitments under the DIP Facility are referred to as the "DIP Commitments"; the loan under the DIP Facility is referred to as the "DIP Loan"; the DIP Lender's claim under the DIP Facility is referred to as the "DIP Claim" or "DIP Claims"; and proceeds received by the Borrowers from the DIP Loan are referred to as the "DIP Proceeds".

Following the Closing Date (as defined below) and conditioned upon entry of the Interim DIP Order or the Final DIP Order, as appropriate, DIP Loan funds may be drawn by the Debtors in multiple draws (in a manner consistent with the "use of proceeds" set forth below); *provided that* the total amount of all draws incurred before entry of the Final DIP Order shall not exceed $1.3 million.

Once repaid, DIP Proceeds cannot be reborrowed.

| | |
|---|---|
| **Credit Bidding:** | The DIP Orders and the related DIP Facility Documents shall provide that, in connection with any sale of any of the Debtors' assets under section 363 of the Bankruptcy Code or under a plan of reorganization, the DIP Lender shall have the right to credit bid all amounts then-outstanding under the DIP Facility (including any accrued interest and fees) in accordance with Section 363(k) of the Bankruptcy Code. |
| **Closing Date:** | The date of the satisfaction or waiver by the DIP Lender of the relevant "Conditions Precedent to Borrowing DIP Loan" set forth below (the "Closing Date"). |
| **Maturity:** | All DIP Obligations (as defined herein) will be due and payable in full in cash unless otherwise agreed to by the DIP Lender in writing on the earliest of: (i) July 31, 2024, (ii) if the Final DIP Order has not been entered, thirty-five days after the Petition Date, (iii) the acceleration of the DIP Loan and the termination of the DIP Commitments upon the occurrence of an event referred to below under "Termination", (iv) the effective date of any plan of reorganization, (v) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (vi) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases, (vii) the consummation of the sale of all or substantially all of the Borrowers' assets and (viii) the date an order is entered in any Bankruptcy Case appointing a Chapter 11 trustee or examiner with enlarged powers (any such date, the "DIP Termination Date").  Principal of, and accrued interest on, the DIP Loan and all other amounts owing to the DIP Lender under the DIP Facility shall be payable on the DIP Termination Date (the "Repaid Amount"). |
| **Budget:** | The "Budget" shall consist of a standard 13-week operating budget setting forth all forecasted receipts and disbursements on a weekly basis for such 13-week period beginning as of the week of the Petition Date, on a line item basis, including, among other things, expected draws under the DIP Facility, available cash, trade payables and ordinary course expenses, fees and expenses relating to the DIP Facility, fees and expenses related to the Chapter 11 Case (including US Trustee fees and professional fees), which Budget shall be in form and substance satisfactory to and |

278261410
4873-0781-6093

approved by the DIP Lender (such Budget shall be supplemented in the manner required pursuant to the "Financial Reporting Requirements" section below).

| | |
|---|---|
| **Use of Proceeds:** | The DIP Loan shall be used solely in accordance with the Budget (including Permitted Variances (as defined below) and the terms and conditions of the DIP Credit Agreement, and the DIP Orders, including (but subject to the Budget) to (i) provide working capital and for other general corporate purposes of the Debtors, (ii) fund the costs of the administration of the Chapter 11 Case (including US Trustee fees and professional fees and expenses) and the section 363 sale process, and (iii) fund interest, fees, and other payments contemplated in respect of the DIP Facility. The DIP Loan shall be funded in periodic installments, not more frequently than weekly, in amounts designed to coincide with the approved Budget and cash flow requirements forecasted therein. For the avoidance of doubt, the Borrowers understand and agree a permitted use shall be to pay the DIP Lender's reasonable costs. fees and expenses relating to the DIP Loan, which shall be paid as set forth in the DIP Facility Documents and the DIP Orders, |
| **Documentation:** | While the DIP Facility initially will be defined pursuant to the terms of this DIP Term Sheet and the Interim DIP Order, the DIP Facility will be evidenced by a credit agreement (the "<u>DIP Credit Agreement</u>"), which shall be filed with the Bankruptcy Court and approved in final form in the Final DIP Order. The DIP Credit Agreement shall be in a form and substance satisfactory to the DIP Lender, and shall reflect the terms set forth in this DIP Term Sheet and the nature of the DIP Facility as a debtor in possession facility. The parties shall also execute such other ancillary documents as the DIP Lender may require (such ancillary documents, collectively with the DIP Credit Agreement, the "<u>DIP Facility Documents</u>"). The DIP Facility Documents shall be in a form and substance satisfactory to the DIP Lender. |
| **Controlled Accounts:** | The Debtors shall maintain all existing deposit accounts (other than excluded accounts to be agreed) and each such deposit account shall remain or become subject to a perfected lien and control pursuant to the terms of the DIP Orders or, as may be requested by the DIP Lender, an enforceable control agreement in favor of the DIP Lender (any such account, a "<u>Controlled Account</u>"). The DIP Credit Agreement, and the DIP Orders (as applicable) shall require the Debtors to maintain the DIP Proceeds in the Controlled Accounts except as permitted to be used in accordance with the Budget and shall prohibit the Debtors from withdrawing funds from the Controlled Accounts after the occurrence and during the continuance of an Event of Default under the DIP Credit Agreement*; provided, however*, that the Debtors shall be permitted to fund the Carve-Out and pay ordinary course administrative claims up to $200,000 in accordance with the terms of the Budget after an Event of Default. |
| **Interest:** | The DIP Loan will bear interest at a fixed rate per annum equal to 15%, accruing monthly, payable in arrears and payable in kind.<br><br>Interest shall be calculated on the basis of the actual number of days elapsed in a 360-day year. |
| **Default Interest:** | Upon the occurrence of and during the continuance of an Event of Default under the DIP Credit Agreement, the DIP Loan and all DIP Obligations shall bear interest at an additional 2.00% per annum. |

3

| | |
|---|---|
| **Fees:** | An origination fee of $300,000 (the "<u>Origination Fee</u>"), which shall be earned and payable upon entry of the Interim DIP Order, and payable by the Debtors to the DIP Lender immediately upon the delivery of the Interim Funding after the Closing Date. For the avoidance of doubt, the payment of the fee will be in the form of an offset to the Interim Funding amount such that the DIP Lender will retain $300,000 of the $1,300,000 of Interim Funding in satisfaction of the obligation. |
| | A closing fee equal to $200,000 (the "<u>Closing Fee</u>"), which shall be earned upon entry of the Interim DIP Order, and payable upon the earlier of (i) the DIP Termination Date, or (ii) the closing of a sale following entry of a Sale Order (as defined below); *provided, however*, that no Closing Fee shall be payable if the DIP Lender is the successful bidder for the Debtors' assets. |
| **Voluntary Prepayments:** | All or any portion of the DIP Loan may be voluntarily repaid at any time, without premium or penalty. |
| **Priority and Security under DIP Facility:** | All obligations of the Borrowers to the DIP Lender under the DIP Facility, including, without limitation, all principal and accrued interest, premiums (if any), costs, fees and expenses or any other amounts due (collectively, the "<u>DIP Obligations</u>"), shall be secured by the following liens and security interests (the "<u>DIP Liens</u>"): |
| | (a)      subject to the Carve Out, and subject to entry of the Final DIP Order, pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority perfected senior priming lien on, and security interest in, substantially all of the assets of the Borrowers, wherever located, that may be subject to a validly perfected security interest in existence on the Petition Date;[2] |
| | (b)      subject to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority perfected lien on, and security interest in, all present and after acquired property of the Debtors, wherever located, not subject to a lien or security interest on the date of commencement of the Chapter 11 Cases (collectively, the "<u>Unencumbered Property</u>"); |
| | (c)      subject to the Carve Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a junior perfected lien on, and security interest in, all present and after-acquired property of the Debtors, wherever located, that is subject to a Permitted Lien (as to be defined in the DIP Credit Agreement) on the Petition Date or subject to a Permitted Lien in existence on the Petition Date that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code; and |
| | (d)      subject to the Carve Out, a first priority perfected lien on, and security interest in, all funds on deposit in the Controlled Accounts. |
| | The property referred to in the preceding clauses (a) through (d) is collectively referred to as the "<u>DIP Collateral</u>" and shall include, without limitation, all assets (whether tangible, intangible, personal or mixed) of the Borrowers, whether now |

---

[2] For purposes of the Interim DIP Order only, the DIP Lender will receive a junior lien pursuant to 364(c)(3) of the Bankruptcy Code on the assets of Insight Software, LLC, Keymed, LLC, MD Office, LLC and MRX Holdings, LLC. If the DIP Lender is not afforded a senior priming lien on the assets of these entities as part of the Final DIP Order, the DIP Lender reserves the right to lower the DIP Commitment in its sole discretion.

owned or hereafter acquired and wherever located, before or after the Petition Date, including, without limitation, all accounts, proceeds of leases, inventory, equipment, equity interests or capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, the proceeds of all claims or causes of action (including upon entry of the Final DIP Order, proceeds of avoidance actions under chapter 5 of the Bankruptcy Code) and all products, offspring, profits and proceeds thereof; *provided however* the DIP Lender shall only avail itself of proceeds from avoidance actions, on a "last look" basis, and only if all other Collateral is inadequate to indefeasibly repay the DIP Obligations in full.

The DIP Liens shall be effective and perfected as of the entry of the Interim DIP Order (subject to the occurrence of the Closing Date) and without necessity of the execution, filing or recording of control agreements, financing statements or other agreements.  However, the DIP Lender may, in its discretion, require the execution, filing or recording of any or all of the documents described in the preceding sentence.

Notwithstanding the foregoing, the DIP Collateral shall not include (and the DIP Liens shall not extend to) assets scheduled and held by the Debtors in trust (but only for so long as such assets are held in trust).

|  |  |
|---|---|
| **Superpriority DIP Claims:** | All DIP Claims shall be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having superpriority over any and all administrative expenses of the kind that are specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve Out. |

The DIP Claims will, at all times during the period that the DIP Loan remains outstanding, remain, in right of payment, senior in priority to all other claims or administrative expenses, subject only to the Carve Out.

|  |  |
|---|---|
| **Carve Out:** | "Carve Out" means an amount equal to the sum of the following (A) : (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (ii) below); (ii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, final order, or otherwise, all accrued and unpaid fees, disbursements, costs and expenses incurred by persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and all accrued unpaid fees, disbursements, costs and expenses incurred by the Committee (if any) pursuant to sections 328 and 1103 of the Bankruptcy Code (the "Committee Professionals," together with the Debtor Professionals, the "Estate Professionals," and such Estate Professional fees in each case in accordance with the Budget, the "Allowed Professional Fees") at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iii) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $200,000 incurred after the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, final order, or otherwise (the amounts set forth |

in this clause (iii),  the "Post-Carve Out Trigger Notice Cap"); *provided, however*, nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement or compensation sought by any such professionals or any other person or entity.  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice (which may be delivered by e-mail (or other electronic means)) by the DIP Lender to the Debtors and their counsel, the United States Trustee, and lead counsel to any Committee appointed in the Chapter 11 Cases, and filed on the docket of the Chapter 11 Cases, which notice may be delivered following the occurrence of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

On a weekly basis—to the extent there is sufficient cash on hand prior to entry of the Final DIP Order, and then following entry of the Final DIP Order—the fees of the Debtors' and committee's professionals provided for in the Budget shall be funded into one of the Debtors' accounts at East West Bank to be used solely to satisfy Allowed Professional Fees in accordance with any applicable orders entered in the Chapter 11 Cases (the "Professional Fee Reserve").  The funds on deposit in the Professional Fee Reserve shall be available to satisfy the obligations owed to Estate Professionals, and the DIP Lender shall have a security interest on any residual amounts remaining in the Professional Fee Reserve after satisfaction in full of all Allowed Professional Fees.

For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve Out shall be senior to all liens and claims securing the DIP Facility, and all other forms of adequate protection, liens, or claims securing the DIP Obligations.

| | |
|---|---|
| **Conditions Precedent to Borrowing DIP Loan:** | The DIP Credit Agreement will contain the following conditions precedent to draws under the DIP Facility: |

- The DIP Lender shall have received a borrowing notice from the Borrowers at least one (1) business day prior to the requested date of funding.

- No Default or Event of Default shall have occurred, and shall be continuing, under the DIP Loan Documents immediately prior to the funding of the DIP Loan or would result from such borrowing of the DIP Loan.

- The making of the DIP Loan shall be authorized pursuant to the Interim DIP Order or the Final DIP Order, as applicable.

- The entry of the Interim DIP Order or Final DIP Order, as the case may be, in form and substance consistent with the terms and conditions set forth herein and otherwise satisfactory to the DIP Lender in its sole discretion, which Interim DIP Order or Final DIP Order, as the case may be, shall be in full force and effect, shall provide DIP Lender with lien priming all other liens, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Lender.

278261410
4873-0781-6093

- Other than the Known Events, since the Petition Date, there shall not have been a Material Adverse Change; *provided that* Known Events and Material Adverse Change shall be defined in the DIP Credit Agreement.

- The Loan Parties shall be in compliance with (i) the Interim DIP Order or the Final DIP Order, as the case may be, and (ii) the Budget (subject to Permitted Variances).

**Affirmative and Negative Covenants:**

The DIP Credit Agreement will contain customary affirmative and negative covenants, including without limitation, the following:

- The Debtors shall deliver to the DIP Lender and its counsel for review and comment, as soon as commercially reasonable, and to the extent practicable, not less than three (3) Business Days prior to filing (or as soon thereafter as is reasonably practicable under the circumstances), all pleadings, motions and other documents material to the DIP Lender (provided that any of the foregoing relating to the DIP Facility shall be deemed material) to be filed by the Debtors with the Bankruptcy Court.

- The Debtors shall promptly deliver to the DIP Lender copies of any offers, term sheets, proposals, presentations, bids or other documents, from any party, related to (i) the restructuring of the Debtors, or (ii) the sale of assets of one or more of the Debtors.  Notwithstanding the foregoing, the Debtors are not required to provide copies of any offers term sheets, proposals, presentations, bids or other confidential information to the DIP Lender if the DIP Lender is either an active bidder, involved in the bidding process, or has expressed its intent to credit bid for the applicable assets.

- The Debtors shall comply with applicable laws (including without limitation, the Bankruptcy Code, ERISA, environmental laws, OFAC, money laundering laws, PATRIOT Act and other anti-terrorism laws and anti-corruption laws), pay taxes, maintain all necessary licenses and permits and trade names, trademarks, patents, preserve corporate existence, maintain appropriate and adequate insurance coverage and permit the DIP Lender's inspection of properties, books and records at reasonable times with reasonable advance notice.

- The Debtors shall limit all transactions with their affiliates (other than ordinary course transactions consistent with past practice among or between any Debtors and their respective subsidiaries), including, without limitation, restrictions on payment of any management fees to non-Borrowers.  Transfers to non-Debtors shall be prohibited unless previously approved by the DIP Lender in writing.

- The Debtors shall maintain their existing cash management system, as requested in their first day motion to do so, modified as appropriate to comply with the DIP Orders.

- The Debtors shall deliver the Budget, updated weekly (and calculated cumulatively for each 1-week Budget period) and adherence to the Budget, subject to Permitted Variances.

278261410
4873-0781-6093

- For purposes hereof, the term "Permitted Variances" will mean, for the first full week period after the Closing Date, to be tested on the third business day of each week following the end of such week period (the "Initial Testing Period") and for the Applicable Rolling Period (as defined below) after the Initial Testing Period (each such period after the Initial Testing Period, together with the Initial Testing Period, the "Testing Periods"): (i) all favorable variances, and (ii) an unfavorable variance of no more than 10% for actual operating disbursements (on an aggregate basis), in each case as compared to the budgeted disbursements, respectively, set forth in the Budget with respect to the applicable Testing Period; notwithstanding the foregoing, Professional Fees shall be excluded from the determination of Permitted Variances. The Permitted Variances with respect to each Testing Period shall be determined and reported to the DIP Lender not later than 5:00 p.m. Central Time on the third business day of each week immediately following the end of each such Testing Period. Additional variances, if any, from the Budget, and any proposed changes to the Budget, shall be subject to the approval of the DIP Lender. Variances will be reported on a cumulative basis matching the relevant Applicable Rolling Period in a format replicating the Budget and will include explanation of variances (including whether they are permanent or temporal in nature). Variances will be carried over across Applicable Rolling Periods solely to the extent they are permanent in nature. "Applicable Rolling Period" means, (i) for the Initial Testing Period, the most recently completed calendar week, (ii) for the second Testing Period after the Closing Date, the most recently completed two calendar weeks, (iii) for the third Testing Period after the Closing Date, the most recently completed three calendar weeks and (iv) for each Testing Period thereafter, the most recently completed four calendar weeks.

- Subject to the Budget, the Debtors shall not incur or assume any additional debt (including intercompany funding) or contingent obligations in respect of debt, give any guaranties in respect of debt, create any liens, charges or encumbrances or incur additional material lease obligations, in each case, beyond agreed upon limits; not merge or consolidate with any other person, change the nature of business or corporate structure or create or acquire new subsidiaries, in each case, beyond agreed upon limits; not amend its charter or by laws; not sell, lease or otherwise dispose of assets (including, without limitation, in connection with a sale leaseback transaction) outside the ordinary course of business and beyond agreed upon limits; not give a negative pledge on any assets in favor of any person other than the DIP Lender; and not permit to exist any consensual encumbrance on the ability of any subsidiary to pay dividends or other distributions to the Borrowers; in each case, subject to customary exceptions or baskets as may be agreed.

- The Debtors shall not, without the DIP Lender's prior written consent, which consent shall not be unreasonably withheld: (i) make, commit to make, or permit to be made any bonus payments (including retention and incentive bonuses) to any employees of the Debtors and their subsidiaries in excess of the amounts set forth in the Budget (on an aggregate basis); or (ii) terminate any member of the Executive Team (as defined in the DIP Facility Documents).

8

- The Debtors shall not permit any change in ownership or control of any Debtor or any change in accounting treatment or reporting practices, except as required by GAAP or as permitted or contemplated by the DIP Credit Agreement.

- Without the prior written consent of the DIP Lender, the Debtors shall not make or permit to be made any change to the DIP Orders.

- The Debtors shall not seek authorization to incur or permit the existence of any claims in the Chapter 11 Cases that are senior to or *pari passu* with the DIP Lender's section 364(c)(1) claim, except for the Carve Out.

- The Debtors shall comply with the Milestones (as defined herein).

| | |
|---|---|
| **Financial Reporting Requirements:** | The Borrowers shall provide to the DIP Lender (hereinafter the "<u>Financial Reporting Requirements</u>"): (i) following delivery of the Budget on the Closing Date, by not later than 5:00 p.m. Eastern Time on the third business day of the second full week following the Closing Date and by not later than 5:00 p.m. Eastern Time on the third business day of every other week thereafter following the end of each Testing Period, an updated Budget, in each case, in form and substance reasonably satisfactory to the DIP Lender for the subsequent 13 week period consistent with the form of the Budget, and such updated Budget shall become the "Budget" for the purposes of the DIP Facility upon the DIP Lender's acknowledgement that the proposed updated Budget is substantially in the form of the Budget and in substance satisfactory to the DIP Lender (provided, that, until a new Budget has been approved by the DIP Lender, the most recently approved Budget shall govern); and (ii) beginning on the third business day of the first full week following the Closing Date (by not later than 5:00 p.m. Eastern Time), and on the third business day of each week thereafter following the end of each Testing Period (by not later than 5:00 p.m. Eastern Time), a variance report (the "<u>Variance Report</u>") setting forth actual cash receipts and disbursements and cash flows of the Debtors for the prior Testing Period and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such period as compared to the applicable Budget delivered by the Debtors, in each case, on a weekly and cumulative rolling 4-week basis (and each such Variance Report shall include explanations for all material variances and shall be certified by the Chief Financial Officer of the Debtors).  The Borrowers will promptly provide notice to the DIP Lender of any Material Adverse Change.

All deliveries required pursuant to this section shall be subject to the confidentiality provision to be negotiated in the DIP Credit Agreement.

At the election of the DIP Lender, on each Monday (or, in the event that such day is not a Business Day then on the Business Day immediately following or on a day mutually agreed upon by the DIP Lender and the Borrower's senior management and professionals) during the Chapter 11 Cases, the Borrowers' senior management and professionals shall host a telephonic meeting for the DIP Lender and their professionals at which the Borrower's senior management and professionals shall provide an update to the DIP Lender (and make themselves available for questions) with respect to the financial and operating performance of the Loan Parties and their estates, including, but not limited to, the Variance Report. |

278261410
4873-0781-6093

| | |
|---|---|
| **Other Reporting Requirements:** | The DIP Credit Agreement will contain other customary reporting requirements for similar debtor in possession financings and other matters as determined by the DIP Lender in its reasonable discretion to be appropriate to the transactions contemplated herein, including, without limitation, with respect to material adverse events, events and notices under other material debt instruments, litigation, contingent liabilities, ERISA or environmental events and consistent with the Documentation Principles (collectively with the financial reporting information described above, the "<u>Information</u>"). |
| **Chapter 11 Cases Milestones:** | The DIP Credit Agreement will include the following milestones related to the Debtors' Chapter 11 Cases (the "<u>Milestones</u>"): |

- No later than seven (7) days after filing a motion to approve the DIP Facility, the Bankruptcy Court shall have entered the Interim DIP Order.

- No later than fourteen (14) days after the Petition Date, the Debtors shall file with the Bankruptcy Court a motion (the "<u>Bid Procedures Motion</u>") to approve procedures for the marketing and sale of the Debtors' assets (the "<u>Bid Procedures Motion</u>") in form and substance reasonably acceptable to the DIP Lender.

- No later than twenty-one (21) days after the Bid Procedures Motion is filed, the Bankruptcy Court shall have entered an order approving the same (the "<u>Bid Procedures Order</u>"). The Bid Procedures Order and applicable bid procedures shall, consistent with this Term Sheet, authorize and approve the DIP Lender's credit bid of the DIP Obligations, in whole or in part, pursuant to Section 363(k) of the Bankruptcy Code, for any or all of the Debtors' assets;

- Not later than 30 days after entry of the Bid Procedures Order, the Bankruptcy Court shall have entered an order approving one or more sales of the Debtors' assets ("<u>Sale Order</u>"); and

- No later than thirty-five days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order.

| | |
|---|---|
| **Events of Default:** | The DIP Credit Agreement will contain events of default customarily found in loan agreements for similar debtor in possession financings (each an "<u>Event of Default</u>"), including, without limitation: |

- failure to make payments when due;

- invalidity of the DIP Loan Documents;

- any of the Debtors shall file a pleading seeking to vacate or modify the Interim DIP Order or the Final DIP Order over the objection of the DIP Lender;

- entry of an order without the prior written consent of the DIP Lender amending, supplementing or otherwise modifying the Interim DIP Order or the Final DIP Order;

- reversal, vacatur or stay of the effectiveness of the Interim DIP Order or the Final DIP Order except to the extent reversed within five (5) Business Days;

278261410
4873-0781-6093

- any violation of any material term of the Interim DIP Order or the Final DIP Order by the Debtors;

- dismissal of the Chapter 11 Case of a Debtor with material assets or conversion of the Chapter 11 Case of a Debtor with material assets to a case under Chapter 7 of the Bankruptcy Code, or any Debtor shall file a motion or other pleading seeking such dismissal or conversion of any Bankruptcy Case;

- appointment of a Chapter 11 trustee or examiner with enlarged powers, or any Debtor shall file a motion or other pleading seeking such appointment;

- any sale of all or substantially all assets of the Debtors pursuant to Section 363 of the Bankruptcy Code, unless such sale is conducted in accordance with the Bid Procedures;

- failure to meet a Milestone, unless extended or waived by the prior written consent of the DIP Lender;

- the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order by the Bankruptcy Court, granting any superpriority claim or lien (except as contemplated herein) which is senior to or *pari passu* with the DIP Claims;

- an order shall be entered in any of the Chapter 11 Cases, without the prior written consent of the DIP Lender: (i) permitting any administrative expense or any claim (now existing or hereafter arising of any kind or nature whatsoever) to have priority equal or superior to the DIP Claims (other than the Carve Out) or (ii) granting or permitting the grant of a lien that is equal in priority or senior to the DIP Liens (other than the Carve Out);

- two or more members of the Executive Management Team resign or otherwise terminate their employment relationship with the Debtor. The term "Executive Management Team" shall be defined in the DIP Facility Documents as including the C-Suite executives and such other key employees as the Debtor may expressly identify;

- the Debtors' filing of a motion seeking entry of an order approving any key employee incentive plan, employee retention plan, or comparable plan, without the prior written consent of the DIP Lender;

- cessation of the DIP Liens or the DIP Claims to be valid, perfected and enforceable in all respects;

- Permitted Variances under the Budget are exceeded for any period of time without consent of or waiver by the DIP Lender;

- subject to entry of the Final DIP Order, the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against any DIP Lender;

- an order shall have been entered by the Bankruptcy Court prohibiting, limiting or restricting the right of the DIP Lender to credit bid for any or all of the Debtors' assets; and

- the payment of any prepetition claim other than (i) as consented to by the DIP Lender, (ii) as authorized by the Budget, (iii) permitted under the terms of the DIP Credit Agreement or (iv) as authorized by the Bankruptcy Court pursuant

11

to the "first day" or "second day" orders or the Interim DIP Order or the Final DIP Order and reflected in the Budget.

**Termination:** Upon the occurrence and during the continuance of an Event of Default, the DIP Lender shall, by written notice to Borrowers, its counsel, the U.S. Trustee and counsel for any statutory committee, terminate the DIP Facility, declare the obligations in respect thereof to be immediately due and payable and, subject to the immediately following paragraph, exercise all rights and remedies under the DIP Loan Documents, the Interim DIP Order, and the Final DIP Order.

**Remedies:** The DIP Lender shall have customary remedies upon the occurrence and during the continuance of an Event of Default, including, without limitation, the following:

Without further order from the Bankruptcy Court, and subject to the terms of the Interim DIP Order and the Final DIP Order (including in respect of any required notices), the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuance of any Event of Default under their respective DIP Loan Documents, all rights and remedies provided for in the DIP Loan Documents, and to take any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable): (a) immediately terminate the Debtors' limited use of any cash collateral; (b) cease making any DIP Loan under the DIP Facility to the Debtors; (c) declare all DIP Obligations to be immediately due and payable; (d) freeze monies or balances in the Debtors' accounts (and, with respect to the DIP Credit Agreement and the DIP Facility, sweep all funds contained in the Controlled Accounts); (e) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Lender against the DIP Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable DIP Lender, including, without limitation, disposition of the DIP Collateral solely for application towards the DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted under the Interim DIP Order and the Final DIP Order, the DIP Loan Documents or applicable law to effect the repayment of the DIP Obligations; provided, however, that the DIP Lender must provide the Debtors, the U.S. Trustee and any official committee with five (5) calendar days' written notice (which may be by email) and file such notice of the Docket of the Chapter 11 Cases before exercising any enforcement rights or remedies; provided, further, that neither the Debtors, any statutory committee nor any other party-in-interest shall have the right to contest the enforcement of the remedies set forth in the Interim DIP Order and the Final DIP Order and the DIP Loan Documents, other than to argue that an Event of Default and/or a DIP Termination Date has not occurred.

The Debtors shall waive any right, without the prior written consent of the DIP Lender, to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Lender set forth in the Interim DIP Order and the Final DIP Order and in the DIP Loan Documents.

**Marshalling and Waiver of 506(c):** Effective upon entry of the Final DIP Order, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral and all proceeds shall be received and applied pursuant to the Final

12

DIP Order and the DIP Loan Documents notwithstanding any other agreement or provision to the contrary.

Effective upon entry of the Final DIP Order, the Debtors (on behalf of themselves and their estates) shall waive, and shall not assert in the Chapter 11 Cases or any successor cases, any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender, upon the DIP Collateral.

**Expenses**            The Borrowers shall jointly and severally pay (i) (x) all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the DIP Lender (including, but limited in the case of counsel, to all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the DIP Lender's counsels, and any successor counsel to each), in each case in connection with the negotiations, preparation, execution and delivery of the DIP Loan Documents and the funding of all DIP Loan under the DIP Facility, including, without limitation, all due diligence, transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the DIP Lender and its counsel and professional advisors in connection with the DIP Facility, the DIP Loan Documents or the transactions contemplated thereby, the administration of the DIP Facility and any amendment or waiver of any provision of the DIP Loan Documents, and (ii) without duplication, all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the DIP Lender (including, but limited in the case of counsels, to all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of outside counsels to the DIP Lender (and any successor counsel), and, to the extent necessary, one firm of local counsel engaged by the DIP Lender in each relevant jurisdiction, and any successor counsel to such primary counsel and local counsel, in each case in connection with (A) the enforcement of any rights and remedies under the DIP Loan Documents, (B) the Chapter 11 Cases, including attendance at all hearings in respect of the Chapter 11 Cases; and (C) defending and prosecuting any actions or proceedings arising out of or relating to the DIP Obligations, the Liens securing the DIP Obligations, or any transaction related to or arising in connection with the DIP Credit Agreement or the other DIP Loan Documents (collectively, the "<u>DIP Lender Reimbursements</u>").

**Indemnification:**    The Debtors shall jointly and severally indemnify and hold harmless the DIP Lender and each of its affiliates and each of their respective officers, directors, employees, controlling persons, agents, advisors, attorneys and representatives of each (each, an "<u>Indemnified Party</u>") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense with respect thereto, arising out of or in connection with or relating to the DIP Facility, the DIP Loan Documents or the transactions contemplated thereby, or any use made or proposed to be made with the DIP Proceeds, whether or not such investigation, litigation or proceeding is brought by any Debtor or any of its subsidiaries, any shareholders or creditors of the foregoing, or any other third party, an Indemnified

13

Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby or under the DIP Loan Documents are consummated, except, with respect to any Indemnified Party, to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct or any of such Indemnified Party's affiliates or their respective principals, directors, officers, employees, representatives, agents, attorneys or third party advisors. No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except, with respect to any Indemnified Party, to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct or any of such Indemnified Party's affiliates or their respective principals, directors, officers, employees, representatives, agents, attorneys or third party advisors. In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages.

| | |
|---|---|
| **Assignments and Participations:** | No consent of the Borrowers shall be required for any assignments to a U.S. subsidiary of the DIP Lender. |
| **Governing Law:** | Except as governed by the Bankruptcy Code, the DIP Facility Documents shall be governed by the law of the State of New York. |
| **Counsel to the DIP Lender:** | Akerman LLP<br>2001 Ross Avenue<br>Suite 3600<br>Dallas, TX 75201<br>Attn: Eduardo S. Espinosa and John H. Thompson<br>Email:  john.thompson@akerman.com<br>         eduardo.espinosa@akerman.com |
| **Counsel to the Debtors:** | Gray Reed<br>1601 Elm Street, Suite 4600<br>Dallas, Texas 75201<br>Attn: Jason S. Brookner and Amber M. Carson<br>Email:  jbrookner@grayreed.com<br>         acarson@grayreed.com |

14

## **Exhibit 2**

**Approved Budget**

**Eye Care Leaders Portfolio Holdings, LLC, et al.**

**DIP Financing Budget 1.21.24**

$ - Thousands

| Week Ending---> | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 19-Jan | 26-Jan | 2-Feb | 9-Feb | 16-Feb | 23-Feb | 1-Mar | 8-Mar | 15-Mar | 22-Mar | 29-Mar | 5-Apr | 12-Apr | |
| **Total Receipts** | $ 420.8 | $ 490.8 | $ 583.6 | $ 611.8 | $ 611.8 | $ 611.8 | $ 607.8 | $ 583.9 | $ 583.9 | $ 583.9 | $ 583.9 | $ 601.2 | $ 608.1 | $ 7,483.4 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Payroll | - | 2.0 | 340.0 | - | 345.0 | - | 345.0 | - | 350.0 | - | - | 350.0 | - | 1,732.0 |
| Hosting and EMR Fees | - | 208.8 | 216.7 | 236.4 | 236.4 | 236.4 | 238.4 | 250.5 | 250.5 | 250.5 | 250.5 | 252.9 | 253.9 | 2,882.0 |
| Consulting and Oustourced Services | - | 132.0 | 80.5 | 84.4 | 84.4 | 84.4 | 84.1 | 82.0 | 82.0 | 82.0 | 82.0 | 81.7 | 81.6 | 1,041.0 |
| Information Technology | - | 72.3 | 68.5 | 59.0 | 59.0 | 59.0 | 58.6 | 56.3 | 56.3 | 56.3 | 56.3 | 57.8 | 58.4 | 717.8 |
| Sales & Marketing | - | 3.6 | 4.0 | 4.8 | 4.8 | 4.8 | 5.6 | 10.8 | 10.8 | 10.8 | 10.8 | 8.4 | 7.4 | 86.4 |
| Other G&A | 5.0 | 21.2 | 6.8 | 21.3 | 21.3 | 21.3 | 8.4 | 19.9 | 19.9 | 19.9 | 19.9 | 7.9 | 20.9 | 213.7 |
| Insurance | - | | | 20.0 | | | | 20.0 | | | | | 20.0 | 60.0 |
| Other Operating | - | 12.1 | 12.1 | 12.2 | 12.2 | 12.2 | 12.4 | 13.3 | 13.3 | 13.3 | 13.3 | 13.3 | 13.3 | 153.0 |
| Sales Taxes | - | 50.9 | - | - | - | 49.7 | - | - | - | 49.7 | - | - | - | 150.3 |
| Critical Vendors | - | - | - | - | 1,000.0 | - | - | - | - | - | - | - | - | 1,000.0 |
| **Total Operating Disbursements** | $ 5.0 | $ 503.0 | $ 728.6 | $ 438.2 | $ 1,763.2 | $ 467.9 | $ 752.5 | $ 452.7 | $ 782.7 | $ 482.4 | $ 432.7 | $ 772.0 | $ 455.5 | $ 8,036.3 |
| **Operating Cash Flow** | $ 415.8 | $ (12.1) | $ (144.9) | $ 173.7 | $ (1,151.3) | $ 144.0 | $ (144.7) | $ 131.2 | $ (198.8) | $ 101.5 | $ 151.2 | $ (170.9) | $ 152.6 | $ (552.9) |
| **Accumulated** | 415.8 | 403.7 | 258.8 | 432.4 | (718.9) | (574.9) | (719.7) | (588.5) | (787.3) | (685.8) | (534.6) | (705.5) | (552.9) | |
| **Other (Sources)/ Uses** | | | | | | | | | | | | | | |
| Advances from DIP Lender | - | (1,300.0) | - | - | (1,500.0) | - | (1,000.0) | - | (800.0) | - | - | - | - | (4,600.0) |
| DIP Loan Costs | - | 300.0 | 150.0 | | | | | | | | | | | 450.0 |
| Creditors Committee | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 325.0 |
| Financial Advisor | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 975.0 |
| Debtor Counsel | 150.0 | 150.0 | 150.0 | 150.0 | 150.0 | 150.0 | 150.0 | 150.0 | 150.0 | 150.0 | 150.0 | 150.0 | 150.0 | 1,950.0 |
| Capital Expenditures | 11.5 | 11.5 | 11.9 | 12.9 | 12.9 | 12.9 | 12.7 | 11.5 | 11.5 | 11.5 | 11.5 | 8.6 | 7.5 | 148.2 |
| Restructuring Costs & UST Fees | - | - | - | 25.0 | - | - | - | 25.0 | - | - | - | 94.5 | 25.0 | 169.5 |
| **Total Other (Sources/Uses)** | $ 261.5 | $ (738.5) | $ 411.9 | $ 287.9 | $ (1,237.1) | $ 262.9 | $ (737.3) | $ 286.5 | $ (538.5) | $ 261.5 | $ 261.5 | $ 353.1 | $ 282.5 | $ (582.3) |
| **Net Cash Flow** | $ 154.4 | $ 726.4 | $ (556.8) | $ (114.3) | $ 85.7 | $ (119.0) | $ 592.6 | $ (155.3) | $ 339.7 | $ (160.0) | $ (110.3) | $ (524.0) | $ (129.9) | |
| **Accumulated** | 154.4 | 880.8 | 324.0 | 209.7 | 295.5 | 176.5 | 769.1 | 613.8 | 953.5 | 793.5 | 683.3 | 159.3 | 29.4 | |
| | | | | | | | | | | | | | | Change |
| **Cash Balance** | $ 73.0 | $ 227.4 | $ 953.8 | $ 397.0 | $ 282.8 | $ 368.5 | $ 249.5 | $ 842.1 | $ 686.8 | $ 1,026.5 | $ 866.6 | $ 756.3 | $ 232.3 | $ 102.4 | $ 29.4 |
| **DIP Facility Balance** | $ - | $ - | $ 1,300.0 | $ 1,300.0 | $ 1,300.0 | $ 2,800.0 | $ 2,800.0 | $ 3,800.0 | $ 3,800.0 | $ 4,600.0 | $ 4,600.0 | $ 4,600.0 | $ 4,600.0 | $ 4,600.0 |

**<u>Exhibit B</u>**

**Summary Lien Chart**

| Name of Entity | UCC Filed Date | Debtor's Name | Secured Party | Collateral | Notes |
|---|---|---|---|---|---|
| Alta Billing Holdings LLC | 07/02/20 | Alta Billing Holdings, LLC | Colorado Bankers Life Insurance Company, as Agent | (a) 100 units of membership interest in Alta Billing, LLC; (b) all books and records pertaining thereto; and (c) all proceeds, supporting obligations, and products of any and all of the foregoing (including all dividends or other income therefrom) and all collateral security and guarantees given by Debtor with respect to any of the foregoing. | Actual borrower is Alta Billing LLC |
| DJRTC, LLC | 03/31/15 | DJRTC, LLC | Southland National Insurance Corporation | All of Debtor's right, title and interest, whether now owned or hereafter acquired or arising, in, to or upon all accounts, chattel paper, commercial tort claims, commodity accounts, deposit accounts, documents, equipment, fixtures, general intangibles (including intellectual property), goods, instruments, inventory, investment property, letter-of-credit rights, payment intangibles, promissory notes, records, software, and all other assets of Debtor and all proceeds (in whatever form or nature) of the foregoing. | |
| IMW EMR LLC | 07/02/20 | IMW EMR, LLC | Colorado Bankers Life Insurance Company, as Agent | (a) 100 units of membership interest in iMedicWare, Inc.; (b) all books and records pertaining thereto; and (c) all proceeds, supporting obligations, and products of any and all of the foregoing (including all dividends or other income therefrom) and all collateral security and guarantees given by Debtor with respect to any of the foregoing. | |
| Insight Software LLC | See notes | Insightsoftware, LLC | De Lage Landen Financial Services, Inc. | All equipment of any make or manufactur financed by or leased to Debtor by Secured Party under Contract Number 500-50294836, together with all components, additions, upgrades, attachments, accessions, substitutions, replacements and proceeds of the foregoing. | Original financing statement filed on May 25, 2018 followed by an amendment on November 2, 2021 and then a continuation on April 18, 2023

No UCC record found for My Vision Express |
| Insight Software LLC | See notes | Insightsoftware, LLC | Golub Capital LLC, as Collateral Agent | All assets of the Debtor, whether now owned or hereafter acquired. | Original financing statement filed on May 25, 2018 followed by an amendment on November 2, 2021 and then a continuation on April 18, 2023 |
| Integrity EMR Holdings LLC | 07/02/20 07/28/20 | Integrity EMR Holdings, LLC | Colorado Bankers Life Insurance Company, as Agent | (a) 100 units of membership interest in Intergrity EMR, LLC; (b) all books and records pertaining thereto; and (c) all proceeds, supporting obligations, and products of any and all of the foregoing (including all dividends or other income therefrom) and all collateral security and guarantees given by Debtor with respect to any of the foregoing. | |
| IO Practiceware, Inc. | 03/18/08 | IO Practiceware, Inc. | BMH Partners, LP | all goods, general intangibles, accounts, inventory, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit and money (as such terms are defined in the Uniform Commercial Code in effect in the State of New York (the "UCC"), including without limitation all software, intellectual property rights, and accounts receivable, in each case whether now owned or hereafter acquired by Debtor, or in which Debtor may now have or hereafter acquire an interest, and all proceeds and products of, all of the foregoing, which Debtor may now have or hereafter acquire an interest. | |
| Keymed Holdings LLC | 07/02/20 | KeyMed Holdings, LLC | Colorado Bankers Life Insurance Company, as Agent | (a) 100 units of membership interest in KeyMed, LLC; (b) all books and records pertaining thereto; and (c) all proceeds, supporting obligations, and products of any and all of the foregoing (including all dividends or other income therefrom) and all collateral security and guarantees given by Debtor with respect to any of the foregoing. | |

| | | | | | |
|---|---|---|---|---|---|
| KEYMED LLC | 06/26/20 | Keymed, LLC | Colorado Bankers Life Insurance Company, as Agent | All of Debtor's right, title and interest, whether now owned or hereafter acquired or arising, in, to or upon all accounts, chattel paper, commercial tort claims, commodity accounts, deposit accounts, documents, equipment, fixtures, general intangibles (including intellectual property), goods, instruments, inventory, investment property, letter-of-credit rights, payment intangibles, promissory notes, records, software, and all other assets of Debtor and all proceeds (in whatever form or nature) of the foregoing. | |
| MD Office LLC | See notes | MD Office, LLC | Southland National Insurance Corporation | All of Debtor's right, title and interest, whether now owned or hereafter acquired or arising, in, to or upon all accounts, chattel paper, commercial tort claims, commodity accounts, deposit accounts, documents, equipment, fixtures, general intangibles (including intellectual property), goods, instruments, inventory, investment property, letter-of-credit rights, payment intangibles, promissory notes, records, software, and all other assets of Debtor and all proceeds (in whatever form or nature) of the foregoing. | Original financing statement filed on March 26, 2015 followed by a continuation on March 6, 2020 - expires March 26, 2025 |
| MedFlow Holdings LLC | 02/11/15 | Medflow Holdings, LLC | Southland National Insurance Corporation | All of Medflow Holdings, LLC's ("Borrower") right, title and interest, whether now owned or hereafter acquired or arising, in, to or upon all accounts, chattel paper, commercial tort claims, commodity accounts, deposit accounts, documents, equipment, fixtures, general intangibles (including intellectual property), goods, instruments, inventory, investment property, letter-of-credit rights, payment intangibles, promissory notes, records, software, and all other assets of Borrower and all proceeds (in whatever form or nature) of the foregoing. | |
| MRX Holdings LLC f/k/a Mplus Holdings LLC | 06/09/15 06/26/20 | Mplus Holdings, LLC MRX Holdings, LLC | Southland National Insurance Corporation Southland National Insurance Corporation, as Agent | All of Debtor's right, title and interest, whether now owned or hereafter acquired or arising, in, to or upon all accounts, chattel paper, commercial tort claims, commodity accounts, deposit accounts, documents, equipment, fixtures, general intangibles (including intellectual property), goods, instruments, inventory, investment property, letter-of-credit rights, payment intangibles, promissory notes, records, software, and all other assets of Debtor and all proceeds (in whatever form or nature) of the foregoing. | |
| Penn Medical Informatics Systems LLC | 07/20/15 | Penn Medical Informatics Systems, LLC | Southland National Insurance Corporation | All of Debtor's right, title and interest, whether now owned or hereafter acquired or arising, in, to or upon all accounts, chattel paper, commercial tort claims, commodity accounts, deposit accounts, documents, equipment, fixtures, general intangibles (including intellectual property), goods, instruments, inventory, investment property, letter-of-credit rights, payment intangibles, promissory notes, records, software, and all other assets of Debtor and all proceeds (in whatever form or nature) of the foregoing. | |