# UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>**EYE CARE LEADERS PORTFOLIO HOLDINGS, LLC,** *et al.,*[1]<br><br>Debtors | Chapter 11<br><br>Case No. 24-80001 (MVL)<br><br>(Jointly Administered) |

**LIMITED OBJECTION AND RESERVATION OF RIGHTS TO THE DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

Colorado Bankers Life Insurance Company, Bankers Life Insurance Company, Southland National Insurance Corporation and Southland National Reinsurance Corporation (the "NC Insurance Companies") by and through their undersigned counsel, hereby submit their objection (the "Objection") to the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate*

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtors' federal tax identification number are as follows: ECL PH Services Group LLC (6746); Eye Care Leaders Portfolio Holdings, LLC (0576); Alta Billing Holdings, LLC (4944); Alta Billing, LLC (4823); Canta Health, LLC (7791); DJRTC, LLC (N/A); ECL Group, LLC (9195); ECL Holdings, LLC (8888); Eye Care Leaders Holdings, LLC (1701); iMedicWare, Inc. (6251); IMW EMR, LLC (6421); IMW Holdings, LLC (3980); Insight Software, LLC (8321); Integrity EMR Holdings, LLC (3877); Integrity EMR, LLC (3716); IO Practiceware, Inc. (4507); IOPW Holdings, LLC (0461); IOPW, LLC (N/A); Keymed Holdings, LLC (0301); Keymed, LLC (9379); MD Office, LLC (9075); MDO Group Holdings, LLC (0435); MDX, LLC (5074); Medflow Holdings, LLC (7716); Medflow, Inc. (N/A); MNI Holdings, LLC (7633); MRX Holdings, LLC (N/A); My Vision Express, Inc. (N/A); Penn Medical Informatics Systems, LLC (4584); PI Software Holdings, LLC (N/A); PI Software, LLC (N/A); PMX, LLC (N/A); Revenue Health Solutions, LLC (7025); RHS Holdings, LLC (N/A); and The Hoehne Group – Software Division, Inc. (7788). The Debtors' principal offices are located at 555 S. Mangum Street, Suite 100, Durham, NC 27701.

*Protection, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 38] (the "DIP Motion"). In support of the Objection, the NC Insurance Companies respectfully states as follows:

### PRELIMINARY STATEMENT[2]

The NC Insurance Companies are important parties-in-interest in the Debtors' Chapter 11 Cases. They have been litigating for over four years with Greg Lindberg ("Lindberg")—the Debtors' ultimate equitable beneficiary—to enforce a rehabilitation plan that requires both the Debtors and their funded-debt creditors to be contributed to a new, independent holding company—NHC Holdings, LLC ("NHC")—whose board would have the express duty to manage the Debtors in a manner that protects the best interests of insurance policyholders. That rehabilitation plan was necessary because Lindberg had pillaged the NC Insurance Companies—as well as many other companies—to the point of insolvency. After he defaulted on the rehabilitation plan, the NC Insurance Companies sued Lindberg and his affiliates and won at trial. However, for over two years, Lindberg has availed himself of every possible tactic in order to forestall complying with a court order that requires, among other things, specific performance of the rehabilitation plan. Rather than satisfying his obligations to the NC Insurance Companies, Lindberg has allowed the Debtors to plunge into bankruptcy, thereby imperiling the repayment of

---

[2] Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the DIP Motion or as defined below.

100 million[3] of policyholder money that was loaned to the Debtors at Lindberg's direction as part of his fraud scheme.[4]

Notwithstanding this troublesome history, the NC Insurance Companies are supportive of efforts to save the Debtors from liquidation and therefore have no objection in principle to the Debtors obtaining appropriate interim postpetition financing, while fully reserving their rights in all respects to any final order entered in connection with the DIP Facility.[5] The NC Insurance Companies do object, however, to the unreasonably aggressive milestones for a sale process—which the Debtors and their financial advisor themselves have admitted are "slightly tight."[6] Instead, any sale should await final rulings from the North Carolina Supreme Court, which will likely result in both the Debtors and their funded-debt-creditors finally being placed under the control of NHC.

At a minimum, the NC Insurance Companies and other parties in interest should have the opportunity to investigate, among other things, the circumstances which led to the filing of the Debtors' Chapter 11 Cases, to what extent Lindberg and his present or former associates have been involved in the events leading up to the filing and whether the Debtors assets will be sold in haste at fire-sale prices and who might benefit it that occurs. Accordingly, the NC Insurance Companies

---

[3] Prior to the NC Insurance Companies being placed into court-supervised insolvency proceedings, Lindberg directed them to loan over $580 million of policyholder money to fifteen shell companies owned by him who, in turn, loaned approximately $100 million to the Debtors. In other words, the NC Insurance Companies are creditors of the Debtors funded-debt creditors, who conduct no business and have no purpose other than to prevent visibility into Lindberg's improper conduct.

[4] As noted in the DIP Motion, Lindberg is currently under two federal indictments, is subject to an SEC enforcement action and is expected to be tried later this year. [Docket No. 38, fn. 6]

[5] Among other things, the NC Insurance Companies reserve all rights in connection with the proposed priming of certain loans as part of a Final DIP Order.

[6] Docket No. 38 ¶ 24.

respectfully request that the Court only approve the DIP Motion if the milestones tied to a sale of the Debtors' assets are removed.

## RELEVANT BACKGROUND

1. Southland National Insurance Corporation ("SNIC"), Bankers Life Insurance Company ("BLIC") and Colorado Bankers Life Insurance Company ("CBL") are each licensed North Carolina domestic life and accident and health insurers. Southland National Reinsurance Corporation is a licensed North Carolina captive insurance company that has engaged in the business of reinsurance.

2. The NC Insurance Companies were engaged in the business of selling annuities, life, accident, and critical condition insurance policies to consumers in North Carolina and elsewhere. The NC Insurance Companies satisfied their obligations to policyholders through cash payments or transfers, with their revenues derived from the sale of annuities and insurance policies and the collection of premiums. The NC Insurance Companies also placed some of their revenues in other investments, to grow the money before their obligations became due.

3. The Debtors share an ultimate owner with the NC Insurance Companies. Lindberg, directly or indirectly, through one or more intermediaries, owns 100% of the shares of stock of each of the NC Insurance Companies. Lindberg is also the sole and exclusive owner of 100% of the shares of Global Growth Holdings, Inc. ("GGHI"). Together, Lindberg and GGHI control in excess of 820 Affiliated Entities.[7] These entities include various holding companies, as well as Operating Companies that conduct business in a number of different industries. The "brand name" for this portfolio of companies is "Global Growth." GGHI is, in effect, the master holding

---

[7] The Lindberg or GGHI-controlled entities, including the Global Growth portfolio, are herein referred to as "Affiliates" or "Affiliated Entities." The Affiliates that conduct revenue-generating business are referred to as "Operating Companies."

company for the Global Growth portfolio.

4. Like the NC Insurance Companies, both the Debtors *and* most of their direct lenders are subsidiaries of GGHI.

5. A substantial portion of the NC Insurance Companies' investments are debt facilities or equity financing arrangements with entities that are under Lindberg's control. These Affiliated Entities consist of Operating Companies and holding companies, special purpose vehicles and trusts, formed and incorporated in North Carolina, other states and overseas, which created a complex network of interrelated loans, financing arrangements and investments. The Affiliated Entities have credit exposure of at least *$2.1 billion*. Of that amount, the NC Insurance Companies hold approximately $*1.25 billion* of the obligations.

6. Through many layers of holding and pass-through companies, Lindberg ultimately owned the controlling interests, as well as the economic interests, in these non-insurance Operating Companies. The NC Insurance Companies own the loans made to intermediary companies, which in turn loaned to or invested in Operating Companies through tiers of holding and pass through companies. The NC Insurance Companies, however, have no equity interest, control, or visibility in the non-insurance Operating Companies or the tiers of holding companies above them.

7. As it relates to these Debtors specifically, the NC Insurance Companies loaned money to various finance or financing companies ("FinCos"), that, in turn, loaned money to the Debtors. For example, the NC Insurance Companies loaned tens of millions of dollars to Baldwin Asset Management, LLC ("BAM"). According to the Debtors, BAM loaned money to Debtors DJRTC, LLC ("DJRTC") and MNI Holdings, LLC ("MNI Holdings"). [Docket No. 14 at Ex. C].[8]

---

[8] The NC Insurance Companies are also identified as the administrative agent on some of the Debtors' loans. [Docket No. 14 at Ex. C]. The NC Insurance Companies were named as administrative agent on loans while the companies were under Lindberg's control; however, they have not been able to confirm that they are the current agent on all of the loans the Debtors identified. In any event, from the NC Insurance Companies' preliminary review of the relevant

But DJRTC and MNI Holdings are not operating companies generating revenue. [*Id.* at Ex. B]. Instead, DJRTC is merely the parent company to Medflow, Inc. [*Id.*]. Similarly, MNI Holdings owns Insight Software, LLC, which owns My Vision Express, Inc., the Operating Company at the end of the chain. [*Id.*].

8. The NC Insurance Companies are owed over $580 million[9] from fifteen FinCos identified as funded-debt-creditors of the Debtors. The Debtors report that they currently owe those same fifteen FinCos over $94 million dollars—approximately 80% of the Debtors' prepetition loan obligations.

**The MOU and the North Carolina Action**

9. As a result of Lindberg's misconduct by diverting policyholder premiums, the NC Insurance Companies experienced liquidity issues which, by June 2019, had become severe enough to warrant them being ordered into rehabilitation. The success or failure of the NC Insurance Companies' receivership will depend on whether the Lindberg-controlled Operating Companies can generate sufficient revenue to repay Affiliated Entities, so that the NC Companies can meet their long-term obligations to policyholders and creditors.

10. In an effort to have the Affiliated Entities repay their debts, the NC Insurance Companies and Lindberg, on behalf of himself and several Affiliated Entities, entered into a Memorandum of Understanding (the "MOU") on June 27, 2019.[10] The MOU sets forth a plan to

---

loan agreements, the NC Insurance Companies, as agent, have no duties to any party to these bankruptcy proceedings. Accordingly, for the avoidance of doubt, this filing is not made pursuant to the NC Insurance Companies' status, to the extent applicable, as administrative agent under any loan agreement.

[9] This amount is as of June 30, 2019 and does not include the interest and default interest accrued on these loans after that date.

[10] One of the agreements entered in connection with, and on the same day as, the MOU was an Interim Amendment to Loan Agreements (the "Interim Loan Amendment") that deferred debt payments by the Affiliated Entities. The Interim Loan Amendment, among other terms, deferred payment of interest from the Affiliated Entities to the NC Insurance Companies and other insurance lenders until February 1, 2020. Because of this deferral, the NC Insurance

reorganize many, although not all, of the Affiliated Entities under a newly-formed holding company—NHC—governed by an independent board. Through this centralized board, the parties planned to restructure the Affiliated Entities' and to improve management to ensure that the Operating Companies' revenue would be sufficient to service their debt to the NC Insurance Companies and other debtholders. More importantly, the MOU binds the NHC board to manage the Affiliated Entities in the best interests of all policyholders.

11. The MOU and ancillary agreements represented a series of transactions intended to protect the best interests of policyholders and to increase the long- term equity value of certain of the affiliated Operating Companies. The Operating Companies and holding companies central to these transactions are specified affiliated companies referred to as "SACs."[11] The SACs are the layers of intermediary and ultimate Operating Companies that are responsible for repaying the policyholders. Once under the NHC's control, the NHC board is bound to operate these companies in the policyholders' best interests. The NHC's goal is to repay the approximately $2.1 billion dollars of policyholder funds that Lindberg improperly loaned to his non-insurance companies— including the Debtors.

12. On the same day that the MOU was executed and as part of the overall transaction described above, the Wake County Superior Court (the "NC Court") entered an Order of Rehabilitation in *Causey v. Southland National Insurance Corporation, et al.*, 19-CV-8664 (Wake County Superior Court) (the "Rehabilitation Order").[12] This ordered the NC Insurance Companies

---

Companies and other lenders have not collected over $100 million in payments that otherwise would have been due since June 27, 2019. In addition, as part of the overall transaction, CBL reduced to writing a loan to Academy Financial Assets, LLC—a Lindberg-controlled intermediary pass-through company without revenue-generating activities—a $40 million revolving line of credit, which the borrower exhausted in less than three months.

[11] The 511 SACs subject to the MOU's restructuring are set forth in Exhibit A to the MOU.

[12] Mike Causey was appointed, in his official capacity on behalf of the State of North Carolina as Commissioner of Insurance, as Rehabilitator for the NC Insurance Companies (the "Rehabilitator"). Pursuant to N.C. Gen. Stat. § 58-

into rehabilitation—a form of statutory receivership—pursuant to Chapter 58 of the North Carolina General Statutes.

13. Lindberg and his Affiliates agreed to restructure the SACs to become subsidiaries, either directly or indirectly of NHC on or before September 30, 2019. However, Lindberg and the other Lindberg-affiliated parties to the agreement failed to perform their obligations, proffering a variety of reasons for why they were unable to do so. A number of these reasons directly contradicted the express representations and warranties that they made to the NC Insurance Companies during the MOU negotiations. By contrast, Lindberg and his companies accepted without protest over $100 million in benefits under the MOU and Interim Loan Amendment.

14. As a result of Lindberg and his related entities' failure to perform under the MOU, on October 1, 2019, the Special Deputy Rehabilitator initiated a North Carolina state court civil action entitled *Southland National Insurance Corporation in Rehabilitation, Bankers Life Insurance Company, in Rehabilitation, Colorado Bankers Life Insurance Company, in Rehabilitation, and Southland National Reinsurance Corporation, in Rehabilitation, v. Greg E. Lindberg, Academy Association, Inc., Edwards Mill Asset Management, LLC, and Private Bankers Life and Annuity Co., Ltd. a/k/a PB Life and Annuity Company, Ltd.*, Gen. Court of Justice, Superior Court Division (Wake County), No. 19 CVS 013093 (the "North Carolina Action").[13]

---

30- 85(a)(1), the Rehabilitator has the authority to appoint special deputy rehabilitators and on June 27, 2019, he appointed Mike Dinius and John Murphy of Noble Consulting Services, Inc. as "Special Deputy Rehabilitators."

[13] The defendants in the North Carolina Action—Greg E. Lindberg, Global Growth Holdings, Inc. f/k/a Academy Association, Inc., Edwards Mill Asset Management, LLC, and Private Bankers Life and Annuity Co., Ltd. a/k/a PB Life and Annuity Company, Ltd.—are collectively referred to herein as the "Defendants."

15. Following two years of discovery and a full trial on the merits held in June 2021, in May 2022 the Honorable A. Graham Shirley of the NC Court entered an "Amended Judgment and Order", setting forth the Court's findings of fact and conclusions of law following the trial. With respect to the NC Insurance Companies' claim for breach of contract, the court found that the Defendants had breached the MOU, rejected their affirmative defenses to their breach, and found that specific performance was the appropriate remedy for the breach. With respect to the NC Insurance Companies' claim for fraud, the Court also found that the Defendants had defrauded the NC Insurance Companies through their false representations and warranties but that the NC Insurance Companies should not recover damages for that fraud unless the remedy of specific performance was reversed.

16. On June 13, 2022, the Defendants appealed the trial court's Amended Judgment and Order. The NC Insurance Companies asserted a cross-appeal on the narrow issue of whether they were entitled to immediate damages for their fraud claim in addition to specific performance for their contract claim.

17. On June 20, 2023, the North Carolina Court of Appeals issued a unanimous opinion agreeing with the NC Insurance Companies both on Defendants' appeal and on the NC Insurance Companies' cross-appeal. Thereafter, the North Carolina Supreme Court granted a "petition for discretionary review" filed by the Defendants only on a legal issue related to the NC Insurance Companies' separate fraud claim—not the specific performance order. In connection with granting discretionary review, the North Carolina Supreme Court granted the Defendants' *Petition for Writ of Supersedeas and Motion for Temporary Stay*, which further delayed reorganization under the MOU. The NC Insurance Companies have sought clarification from the North Carolina Supreme Court on the scope of the supersedeas stay where the only issue being

reviewed is unrelated to the MOU reorganization.[14]

18.     If the NC Insurance Companies' motion to clarify is granted and the North Carolina Supreme Court determines that the MOU's reorganization should not be further delayed, jurisdiction will return to the North Carolina trial court to implement the MOU reorganization. As part of the Amended Judgment and Order the trial court previously ordered the MOU reorganization to be completed within a mere 45-days.

19.     Almost every Debtor involved in these proceedings and their funded-debt-creditors are subject to the MOU's restructuring. All but three of the Debtors and all but four of the Debtors' funded-debt-creditors are SACs that should have been contributed to NHC in September 2019. The Debtors and their funded-debt-creditors would have been properly managed by NHC's independent board to ensure they perform well and that their revenues go toward repaying policyholders. Instead, the Debtors and their funded-debt-creditors have continued to operate outside of NHC's management and had to resort to filing for bankruptcy—which severely imperils the NC Insurance Companies' investments and plan to pay policyholders.

20.     As a result of all of the foregoing, specific performance of the MOU that the trial court ordered and the North Carolina Court of Appeals affirmed has not yet occurred. The MOU's reorganization should have been completed more than four (4) years ago, but the Defendants refuse to perform their contractual obligations and remain in control of the hundreds of SACs that are intended to serve as the ultimate source of repaying the NC Insurance Companies' funds. As this delay continues, the harm to the NC Insurance Companies and their policyholders only grows. As a result, in December 2022 and May 2023, the NC Court found BLIC, CBL, and SNIC insolvent

---

[14] *See Alexa Scherzinger,* LAW 360, Accused Fraudster Hurting Policyholders, NC Justices Told (published Jan. 24, 2024) annexed hereto as Exhibit A.

and ordered them into liquidation.[15]

## LIMITED OBJECTION

21. It is well settled that, to obtain postpetition financing, the Debtors must prove, among other things, that the terms of a proposed DIP facility are fair, reasonable and adequate given the circumstances of the debtor and the proposed lender. *In re Margaux Oro Partners, LLC*, No. 11-30337-11, 2011 WL 6370637, at *3 (Bankr. N.D. Tex. June 28, 2011) (entering a final order noting the terms of the DIP Facility were "fair, just and reasonable under the circumstances, are ordinary and appropriate for secured financing to debtors-in-possession"); *In re L.A. Dodgers, LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (*citing In re St. Mary. Hosp.,* 86 B.R. 393, 401 (Bankr. E.D. Pa. 1998)); *In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (holding that proposed financing should be beneficial and reasonable). As discussed below, at least one aspect of the proposed DIP Financing—the sale milestones—do not satisfy this standard under the unique circumstances of these cases and accordingly, should not be approved.

22. The Final DIP Order effectively forecloses any attempt at reorganization by setting aggressive deadlines for the Debtors to enter, and for this Court to approve, a sale of substantially all of the Debtors' assets. While the Debtors contend in their "first day declaration" that they seek to "stabilize operations and work towards a restructuring or a value-maximizing sale of substantially all their assets for the benefit of their estates and all parties in interest." [Docket No. 14 ¶ 9], the DIP Facility milestones make it clear that a restructuring is not really contemplated. Instead, the very compressed deadlines virtually guarantee a sale of the Debtors to the DIP Lenders

---

[15] A liquidation order generally triggers the state guaranty associations to step in and pay policyholder claims up to their state guaranty limits—usually $250,000 to $300,000 for annuities. However, Lindberg has caused the NC Insurance Companies' parent company, GBIG Holdings, LLC, improperly to appeal both orders. Lindberg's meritless litigation has resulted in holding up the guaranty association's payments to BLIC and CBL's policyholders.

themselves.

23. In addition, the DIP milestones raise a significant risk of triggering an Event of Default under the DIP Facility if anything other than a sale to the DIP Lender occurs. This is unlikely to result in a value maximizing transaction for the Debtors.

24. Specifically, the DIP Facility terminates upon, among other events, in six (6) months or upon the Debtors' failure to meet the milestones set forth therein, which include that: (i) within fourteen (14) days of the Petition Date, the Debtors will file their Bid Procedures Motion; (ii) within 21 days of that filing, the Court will enter the order approving the Bid Procedures Motion and permitting the DIP Lenders to credit bid the DIP Obligations, in whole or in part, pursuant to section 363(k); (iii) the Court will enter the Sale Order approving the sale or sales of the Debtors' assets; and (iv) within 35 days of the Petition Date, the Court will enter the Final DIP Order. By inextricably linking the DIP Facility to a highly expedited sales process, the Debtors, through the DIP Motion, will effectively be seeking this Court's approval to facilitate the circumvention of the MOU and the Rehabilitation Order. [Docket No. 38 at 13-14; 83].

25. Here, ratification of the milestones all but guarantees that the Debtors will not meet them, resulting in an Event of Default. For example, the following select, but likely events could potentially trigger an Event of Default under the DIP milestones: (i) once the MOU becomes effective and NHC moves to implement it; (ii) if the Debtors are contributed—as required—to NHC; (iii) if the NHC board—once in control of the Debtors—determines to dismiss the bankruptcy proceedings or promulgate their own plan of reorganization; (iii) if the NC Insurance Companies take action to unwind certain transactions by Lindberg that relate to the Debtors; (iv) if the NC Insurance Companies exercise their rights to investigate or seek guidance from the NC Court regarding whether any sale of the Debtors' assets are permitted under the MOU, the NC

Insurance Companies' rehabilitation plan; (v) if the NC Insurance Companies challenge any action by the Debtors to subordinate liens as a violation of the MOU and the McCarran–Ferguson Act, 15 U.S.C. § 1011 *et seq.* (the "McCarran– Ferguson Act"); and/or (vi) if the NC Insurance Companies challenge this Court's jurisdiction to approve such a sale under the McCarran–Ferguson Act.[16]

26. Further, the imposition of these milestones will likely hamper the Debtors' negotiating leverage, as it broadcasts to vendors and potential purchasers that the Debtors risk causing an Event of Default if they fail to close a sale of their assets by one of the stated milestones. Given the level of complexity and potential litigation that may occur in connection with such complex issues as the impact of the McCarran–Ferguson Act on these proceedings, the NC Insurance Companies believe that these dates must be eliminated.

27. Finally, due to the expedited interim hearing on the DIP Motion, the NC Companies have not had the opportunity to take any discovery into the circumstances necessitating the Debtors' bankruptcy filings, or any evidence which the Debtors will seek to admit at the interim hearing. For example, the UCC financing statements which the Debtors intend to introduce into evidence purport to show deficiencies in the effectiveness of certain liens on the Debtors' assets. The Debtors have also indicated that they intend to seek to recharacterize, subordinate or prime certain liens and interests in the Debtors' assets. While the NC Insurance Companies take no position on these matters at this time, they fully reserve their rights with respect to any such actions.

---

[16] The McCarran–Ferguson Act provides that any state statute that regulates the "business of insurance" reverse-preempts any federal statute that does not specifically regulate the business of insurance. *See Stephens v. Am. Int'l Ins. Co.,* 66 F.3d 41, 43 (2d Cir. 1995) (holding that anti-arbitration provisions in Kentucky insurance statute regulating the liquidation of insurance companies reverse-preempted the Federal Arbitration Act.); *Johnston, et. al. v. Lindberg, et. al.,* Case No. 23-01000 (LGB) (Bankr. S.D.N.Y. Mar. 10, 2023) (Order Granting Motion to Stay Adversary Proceeding) [ECF No. 78].

**RESERVATION OF RIGHTS**

28.     The NC Companies reserve the right to assert additional objections to the DIP Motion, the DIP Facility, the Final Order, and any other documents related thereto (including the Budget and underlying DIP Credit Agreement), prior to, or at the final hearing on the DIP Motion.

**WHEREFORE**, the NC Insurance Companies respectfully request that the Court (a) only approve the DIP Motion if the sale milestones are eliminated, and (b) grant such other and further relief as the Court may deem just and proper.

Dated: New York, New York
January 25, 2024

**Squire Patton Boggs (US) LLP**

By: */s/ Norman N. Kinel*
Norman N. Kinel (*pro hac vice* pending)
Michelle N. Saney (*pro hac vice* pending)
1211 Avenue of the Americas, 26th Floor
New York, NY 10036
Telephone: (212) 872-9800
Facsimile: (212) 872-9815
Email: norman.kinel@squirepb.com

**Squire Patton Boggs (US) LLP**

By: */s/ Michael S. Forshey*
Michael S. Forshey (TX Bar No. 07264250)
2200 Ross Avenue, Suite 4100W
Dallas, TX 75201
United States of America
Telephone: (214) 758-3540
Facsimile: (214) 758-1550
Email: michael.forshey@squirepb.com

**Williams Mullen**

By: */s/ Wes J. Camden*
Wes J. Camden (*pro hac vice* pending)
Caitlin Poe (*pro hac vice* pending)
Lauren Fussell (*pro hac vice* pending)
301 Fayetteville Street, Suite 1700
P.O. Box 1000 (27602)
Raleigh, NC 27601
Telephone: (929) 981-4064
Facsimile: (919) 981-4300
Email: wcamden@williamsmullen.com

*Co-Counsel for Colorado Bankers Life Insurance Company, Bankers Life Insurance Company, Southland National Insurance Corporation and Southland National Reinsurance Corporation*

**Certificate of Service**

I certify that on January 25, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Michael S. Forshey*
Michael S. Forshey
